### In re CANYON SYSTEMS CORPORATION, Debtor.

**John Paul Rieser, Trustee, Plaintiff,**

v.

**Dennis Hayslip, et al., Ron Piljay, et al., Camden Enterprises, Lynn A. Kubal, Rose Kubal, Gail D. Mayes, Gregory N. Mayes, Gregory McCollum, Gerald L. Wendling, Mary A. Wilkie, and Nena Grant, Defendants.**

Bankruptcy No. 97–33774.
Adversary Nos. 03–2605, 03–2606, 03–2607, 03–2609, 03–2610, 03–2611, 03–2612, 03–2613, 03–2614, 03–2615, 03–2616.

United States Bankruptcy Court,
S.D. Ohio,
Eastern Division at Columbus.

March 31, 2006.

John Paul Rieser, Patricia Friesinger, Dayton, OH, for Plaintiff.

Thomas R. Noland, Tina Woods, Dayton, OH, for Defendants Huffman, Marohl, Osier, Piljay, Camden Enterprises, Lynn A. Kubal, Rose Kubal, McCollum, Wendling, Wilkie and Grant.

Gary C. Schaengold, Dayton, OH, for Defendant Scott Johnson.

Melissa K. Schindler, Dayton, OH, Richard B. Reiling, Springboro, OH, for Defendants Schraeder, Withrow, Julia Carmack and Jeffrey Carmack.

Barry S. Galen, Dayton, OH, for Debtor.

## MEMORANDUM OPINION AND ORDER GRANTING IN PART AND DENYING IN PART TRUSTEE'S MOTION FOR PARTIAL SUMMARY JUDGMENT

JOHN E. HOFFMAN, JR., Bankruptcy Judge.

Pending before the Court in these adversary proceedings are identical motions for partial summary judgment (collectively, "Motion") filed by the Plaintiff, John Paul Rieser, Chapter 7 Trustee ("Rieser" or "Trustee"), against all remaining defendants ("Defendants") in all remaining adversary proceedings in the bankruptcy case of Canyon Systems Corporation ("Canyon" or "Debtor"). For the reasons explained below, the Motion is granted in part and denied in part.

### I. Jurisdiction

The Court has jurisdiction to hear and determine these adversary proceedings pursuant to 28 U.S.C. §§ 157 and 1334 and the general order of reference entered in this district. These are core proceedings. 28 U.S.C. § 157(b)(2).

### II. Procedural Background

Canyon filed a voluntary Chapter 11 petition on July 7, 1997 ("Petition Date"), following the collapse of its gold coin sales programs.[1] These programs promised participants large profits from purchasing and selling gold bullion coins. Less than a month after the Chapter 11 case was filed, and after the United States Trustee had moved to convert the case to a Chapter 7 liquidation proceeding, or in the alternative to appoint a Chapter 11 trustee, Canyon agreed to convert to Chapter 7. Rieser was appointed Chapter 7 Trustee.

On July 6, 1999, the Trustee filed in excess of 400 adversary proceedings to recover money from individuals and companies who had bought or sold gold coins through one of Canyon's programs. The complaints contain multiple federal and state law causes of action, but the gravamen of each is that prepetition transfers of cash and gold coins made to participants in Canyon's gold coin sales programs—which the Trustee alleges constituted a Ponzi scheme—are subject to avoidance and recovery. On March 29, 2000, Judge William A. Clark, the judge originally assigned to the Canyon case, entered an order reassigning the case and all related adversary proceedings to Judge Hoffman.

After his appointment as Trustee, Rieser pursued a strategy of negotiating settlements with all investors in the alleged Ponzi scheme before forging ahead with

---

1. Canyon operated two gold coin sales programs: the Double Eagle Gold Coin Program and the Advantage Gold Coin Program. The slight differences in the two programs are not material and thus will not be detailed in this opinion.

the litigation against the Defendants, each of whom he asserts played a larger role in Canyon than being a mere investor in the scheme—some were officers, directors and/or key employees of Canyon, while others were relatives of Jackson Johnson ("Jack Johnson"), the founder, President and CEO of Canyon. Thus, the Trustee asked that trial on the complaints naming the Defendants ("Complaints") be deferred until the other nearly 400 adversary proceedings had been resolved. Counsel for the Defendants did not challenge the Trustee's decision to defer a day of reckoning. In fact, counsel for most of the Defendants sought, and received, multiple extensions of time to answer, move or otherwise plead (some spanning more than a year) in response to the Complaints. Over the ensuing several years, Rieser settled or dismissed his claims against all parties to the Canyon adversary proceedings except the Defendants identified below:[2]

| Defendant | Relationship with Debtor | Amounts Transferred | |
|---|---|---|---|
| D. Scott Johnson ("Scott Johnson") Individually and through DSJ Enterprise Trust # 1 and Enterprise Trust # 2 | Son of Founder/CEO Independent Affiliate | 84,570.00 | Commissions |
| | | 209,800.00 | Overrides |
| | | 65,200.00 | Comp Gold |
| | | **359,570.00** | **Total** |
| James W. Huffman ("Huffman") | Director | 25,030.00 | Commissions |
| | | 2,900.00 | Overrides |
| | | 13,950.00 | Comp Gold |
| | | **41,880.00** | **Total** |
| John E. Marohl ("Marohl") | Director Independent Affiliate | 20,500.00 | Commissions |
| | | 2,200.00 | Overrides |
| | | 0.00 | Comp Gold |
| | | **22,700.00** | **Total** |
| V. William Osier ("Osier") | Director | 0.00 | Commissions |
| | | 0.00 | Overrides |
| | | 1,195.00 | Comp Gold |
| | | **1,195.00** | **Total** |
| Ron Piljay ("Piljay") | Director Independent Affiliate | 15,810.00 | Commissions |
| | | 2,200.00 | Overrides |
| | | 3,700.00 | Comp Gold |
| | | **21,710.00** | **Total** |

**2.** One of the remaining Defendants, Lynn A. Kubal, has died. The Trustee has reported that he is awaiting information regarding the estate of Lynn A. Kubal to determine whether to substitute the estate as a party defendant. Reply of Plaintiff to Response of Defendants Marohl, et al. ("Reply") at 2 (Adv.Pro. No. 03–2605, Doc. 268). The Trustee also reported that he is reviewing a possible dismissal of the complaint against V. William Osier, and that he has reached a settlement with Gail D. Mayes and Gregory N. Mayes and is awaiting signatures on settlement documents. *Id.* at 2. Thus, it appears that the Trustee is actively pursuing 14 remaining defendants.

As stated above, the Trustee opted to negotiate settlements with all the ordinary investors in Canyon's gold sales programs before pursuing his claims against those Defendants who played a greater role in the alleged Ponzi scheme. Each Defendant listed in the chart above seems to fit into this category—i.e., they were more than a mere investor in the gold coin programs—other than Nena Grant. Ms. Grant was not a Canyon officer, director, employee or Independent Affiliate (described *infra* at 13). Nor was she related to a Canyon insider. Thus, it is unclear why the Trustee grouped Ms. Grant with the other remaining Defendants, other than the fact that she appears to be one of the few ordinary investors with whom the Trustee was unable to negotiate a settlement.

| | | | |
|---|---|---|---|
| Kim Schraeder ("Schraeder") Individually and through Trust # 1 | Step-daughter of Founder/CEO Director Independent Affiliate | 60,150.00<br>15,300.00<br>30,700.00<br>**106,150.00** | Commissions<br>Overrides<br>Comp Gold<br>**Total** |
| Lisa Withrow ("Withrow") Individually and through Trust # 1 | Step-daughter of Founder/CEO Director Independent Affiliate | 46,770.00<br>9,200.00<br>33,900.00<br>**89,870.00** | Commissions<br>Overrides<br>Comp Gold<br>**Total** |
| Julia M. Carmack | Daughter of Founder/CEO Independent Affiliate | 41,792.38<br>7,200.00<br>43,550.00<br>**92,542.38** | Commissions<br>Overrides<br>Comp Gold<br>**Total** |
| Jeffrey T. Carmack | Son–in–Law of Founder/CEO Independent Affiliate | 220.00<br><br>2,100.00<br>4,300.00<br>**6,620.00** | Commissions<br><br>Overrides<br>Comp Gold<br>**Total** |
| Camden Enterprises | Independent Affiliate | 17,450.00<br>1,800.00<br>**19,250.00** | Commissions<br>Overrides<br>**Total** |
| Lynn A. Kubal | Independent Affiliate | 45,330.00<br>6,100.00<br>12,800.00<br>**64,230.00** | Commissions<br>Overrides<br>Comp Gold<br>**Total** |
| Rose Kubal | Independent Affiliate | 8,358.80<br>800.00<br>8,100.00<br>**17,258.80** | Commissions<br>Overrides<br>Comp Gold<br>**Total** |
| Gail D. Mayes | Independent Affiliate | 5,860.00<br>1,000.00<br>14,000.00<br>**20,860.00** | Commissions<br>Overrides<br>Comp Gold<br>**Total** |
| Gregory N. Mayes | Independent Affiliate | 5,340.00<br>500.00<br>48,800.00<br>**54,640.00** | Commissions<br>Overrides<br>Comp Gold<br>**Total** |
| Gregory McCollum ("McCollum") | Independent Affiliate | 71,220.00<br>7,100.00<br>62,900.00<br>**141,220.00** | Commissions<br>Overrides<br>Comp Gold<br>**Total** |
| Gerald A. Wendling ("Wendling") | Independent Affiliate | 25,260.00<br>2,500.00<br>57,000.00<br>**84,760.00** | Commissions<br>Overrides<br>Comp Gold<br>**Total** |
| Mary A. Wilkie ("Wilkie") | Independent Affiliate | 160,447.97<br>63,500.00<br>72,625.00<br>**296,572.97** | Commissions<br>Overrides<br>Comp Gold<br>**Total** |
| Nena Grant ("Grant") | Investor | 23,300.00<br>**23,300.00** | Comp Gold<br>**Total** |

By way of the Motion, the Trustee seeks a ruling on the following issues: (1) whether Canyon was engaged in a Ponzi scheme from May 1996 through the Petition Date; (2) whether Canyon was continuously insolvent from its inception in May 1996 through the Petition Date; (3) whether the Trustee may, under § 548 of the Bankruptcy Code,[3] avoid all transfers of cash and gold coins made to each Defendant in the one year preceding the Petition Date that were in excess of that Defendant's original investment—sums referred to by the Trustee as the "false profits" received by the Defendants;[4] (4) whether the Trustee may, under § 544(b) of the Code and the Ohio Uniform Fraudulent Transfer Act ("UFTA"), avoid all false profits transferred to the Defendants from the time Canyon's gold coin sales programs began in May 1996 through the Petition Date; (5) whether the defense afforded to good-faith transferees for value under § 548(c) of the Code is available to the Defendants; and (6) whether the Trustee may set aside certain obligations, avoid contracts with and/or transfers to the Defendants, and recover damages and reasonable attorney

fees from them under § 544 of the Code and Ohio Revised Code §§ 1333.91–1333.95—the so-called Ohio Pyramid Sales Act.[5] Defendants Marohl, Huffman and Piljay also filed a motion for summary judgment ("Cross–Motion") (Doc. 251) in Adv. Pro. No. 03–2605. After the Trustee responded (Doc. 257) and Defendants replied (Doc. 269), the Court heard argument on both the Motion and Cross–Motion. At the conclusion of the argument, the Court entered an oral ruling denying the Cross–Motion, which was journalized by the Order Denying Motion of Defendants John Marohl, James Huffman and Ronald Piljay for Summary Judgment (Doc. 275). The Trustee's Motion was taken under advisement.

Along with the Motion and Cross–Motion, the parties filed a significant quantity of evidentiary material, including a number of deposition transcripts and related exhibits. The parties did not object to the admissibility of any of the exhibits attached to the Motion, the Cross–Motion, the responses or depositions.[6]

---

**3.** On April 20, 2005, the Bankruptcy Abuse Prevention and Consumer Protection Act ("BAPCPA") was signed into law. Because the Debtor's bankruptcy petition was filed before April 20, 2005, the amendments to the Bankruptcy Code made by BAPCPA are not applicable in this case. Thus, all references to the Bankruptcy Code, and all citations to, or quotations of, specific Code provisions, shall refer to the Code (or particular sections of the Code) prior to its amendment by BAPCPA—i.e., 11 U.S.C. §§ 101–1330 (2000).

**4.** While the Complaints seek avoidance and recovery of transfers of gold and cash made to the Defendants, the Motion seeks summary judgment only on the question of avoidability.

**5.** In Page's Ohio Revised Code Annotated, the actual heading preceding the provisions dealing with pyramid schemes—Ohio Revised Code §§ 1333.91–1333.95—is "Pyramid Sales Plan or Program." *See* Ohio Rev.Code Ann.

§§ 1333.91–1333.95 (LexisNexis 2002). Because Ohio courts have referred to these provisions, collectively, as the "Ohio Pyramid Sales Act," *see State v. Beckley,* 5 Ohio St.3d 4, 448 N.E.2d 1147, 1147 n. 2 (1983); *Brown v. Codex, Inc.,* 1981 WL 169161 (Ohio Ct. Com.Pl. Feb. 5, 1981), the Court will do so here.

**6.** Prior to the filing of the Motion and Cross–Motion, the Court entered a Supplemental Pretrial Scheduling Order Following Status Conference ("Pretrial Order") (Doc. 217) in Adversary Proceeding No. 03–2605. Half of the remaining Defendants are parties to that adversary proceeding. They include Huffman, Marohl, Piljay and Osier (all represented by attorney Thomas R. Noland), Schraeder, Withrow and the Carmacks (all represented by attorney Richard Reiling), and Scott Johnson (represented by attorney Gary Schaengold). Several of the other De-

### III. Factual Background

Canyon was incorporated in Delaware in 1989 or 1990. (Section 341 Meeting of Creditors Transcript of Proceedings ("341 Tr.") 20.) Canyon was a dormant corporation until mid-May 1996, when it began operating in Ohio under the name of Canyon Coin Collectors ("CCC"). (341 Tr. 20–21, 27.) The company conducted business in 30 states from its main office in Kettering, Ohio and briefly opened small offices in Safety Harbor, Florida and Johnstown, Pennsylvania. (341 Tr. 21, 23, 26.)

Canyon was the brainchild of Jack Johnson, the company's President and CEO.[7] (341 Tr. 12.) Although Canyon's gold coin sales programs varied in some respects, in simplified form, they called for a participant's payment of a certain sum of money[8] in return for which the participant would receive gold coins valued at 70% of the amount paid. The gold coins sold by Canyon were not of "numismatic," or collector, quality, but rather were the type known as bulk gold, which is sold on the gold spot market. This transaction would result in the placement of the participant's name on a list to receive—at some unspecified time within 18 months of the purchase—additional gold coins worth 70% of the initial amount paid. These additional gold coins were known as "Complimentary Gold" or "Comp Gold." As names of new buyers were added to the top of the list, the original participant's name would move to-

fendants—the Kubals, Camden Enterprises, McCollum, Wendling, Wilkie and Grant are named in separate complaints and are also represented by Mr. Noland. The two remaining Defendants—Gail D. Mayes and Gregory N. Mayes, are currently not represented by an attorney, but both were represented by Mr. Noland until he withdrew as their counsel on June 10, 2003. Both Mayes Defendants have settlements pending. Thus, while the Pretrial Order setting forth the format for summary judgment motions was not entered in all of the adversary proceedings, counsel for all parties received the Pretrial Order and are presumably aware of its contents. The Pretrial Order provides that a party filing a motion for summary judgment must include a "Statement of Material Facts" setting forth, in numbered paragraphs, each material fact as to which the moving party contends there is no genuine issue. The Pretrial Order requires each fact listed to be supported by a specific citation to the record. The Pretrial Order further requires that: (1) the party opposing a motion for summary judgment file a response to the Statement of Material Facts that mirrors the Statement of Material Facts by admitting or denying each of the movant's factual assertions in matching numbered paragraphs; (2) each denial be supported by a specific citation to the record; and (3) the non-movant's response set forth any additional material facts that the non-movant contends are not in dispute. Al-

though the Trustee followed this procedure up to a point, he included multiple factual allegations in each paragraph and submitted a number of deposition transcripts and related exhibits, but failed to explain the relevance of much of the material, the majority of which he did not cite in the Motion. The Defendants failed completely to respond to the Trustee's factual allegations in the manner the Pretrial Order required. Thus, the Court was required to traverse a complicated set of facts involving a large number of defendants and a significant quantity of documentary evidence without the roadmap the parties were ordered to supply.

7. At the same time Canyon filed its Chapter 11 petition, Jack Johnson and his wife Karen Johnson filed a joint Chapter 11 case. A Chapter 11 trustee was appointed in that case, which was later converted to a Chapter 7 proceeding. *See Jackson Melvin Johnson and Karen Francis Johnson (In re Johnson)*, Case No. 97–33775, Docs. 319, 451.

8. Each transaction included processing fees and checks issued in small amounts by the Debtor to the purchaser in order to round up to even numbers. For simplicity's sake, and because these amounts do not fundamentally change the outcome of the dispute, the Court will not include these adjustments in its examples. The Court notes, however, that most of these fees merely added to Canyon's liabilities.

ward the bottom of the list. When the name reached the bottom of the list, the participant would receive Comp Gold. *See* Motion, Ex. A, Marketing Brochure for Double Eagle Coin Program ("Double Eagle Brochure") and Motion, Ex. B, Marketing Brochure for Advantage Coin Program ("Advantage Brochure"). How quickly a participant's name moved to the bottom of the list and he/she received Comp Gold depended on the volume of coins sold to new participants. *See* Motion, Ex. C, Independent Affiliate Training Video ("Training Video"), Wilkie presentation.

By way of illustration, a purchaser paying $1,000 to Canyon would receive, within a few days of his/her purchase, gold coins having a value of $700. Sometime within the ensuing 18 months, he or she would receive an additional $700 in Comp Gold, for a total, over time, of $1,400 in gold coins in return for the initial $1,000 payment. Of the $700 in Comp Gold received, the first $300 would ostensibly make the investor "whole," by returning his/her entire $1,000 outlay, and the next $400 would constitute the investor's "profit" on the transaction. The total return on an investment of $1,000 would be 35%, since a $50 processing fee would be deducted from the $700 in Comp Gold distributed.

The Double Eagle Brochure contains the following description of the program:

> Fill out the purchase order for the amount you wish to purchase. Purchases can be from $200 up to $1000 a business day, but they must be in $100 increments (for example, $200, $300,

$500, etc.). There is a 5% processing fee on every order.

> For each $100 Gold Coin Purchase, CCC will list the customer on CCC's Double Eagle and Advantage Program list. At the end of each week the total profits from sales will be calculated and a substantial amount of the profits from sales will be used to purchase complimentary gold for the next succeeding customer on the Double Eagle and Advantage customer list.

> As new sales are generated, you will move down the list to become the next succeeding customer on the Double Eagle and Advantage customer list. When you are at the bottom of the list, you will receive your complimentary gold.

> . . . .

> The American Eagle gold coins can be easily and quickly converted into cash. This makes it possible to purchase again and again to maximize your purchases to receive more complimentary gold.[9]

Motion, Ex. A, Double Eagle Brochure. The Double Eagle Brochure also contains the following example of how an initial $1,000 investment would, within an 18–month time frame, yield $1,350.[10]

| Purchase | Complimentary |
|---|---|
| $1000 | DE $650 |
| | ADV 350 |

| | |
|---|---|
| You now have | $1000 |
| | $1000 |
| | $2000 |
| | x.70 (approximate %) |
| | $1400 |

---

9. The Advantage Brochure is substantially the same, except that it provides for a daily minimum purchase of $100, and it substitutes the phrase "the majority of the profits" for the phrase "a substantial amount of profits." Motion, Ex. B, Advantage Brochure.

10. Although the Double Eagle and Advantage Brochures do not state a specific time frame for the payment of Comp Gold, purchase orders signed by participants in the Debtor's gold coin sales programs state that Comp Gold would be payable no later than 18 months from the initial date of purchase. *See* Scott Johnson Dep., Ex. 5, Advantage Program Purchase Order ¶ 8.

$$\frac{-50}{\$1350} \text{ (processing fee)} \text{ (approximate)}$$

This example shows that with a $1000 purchase, you can receive complimentary American Eagle gold coins of $1000.00. If you chose to sell them you would have approximately $1350.00.[11]

*Id.* Most participants, however, liquidated both their initial gold and their Comp Gold immediately, rolling it over as a new purchase to increase the potential for receiving more Comp Gold. (Huffman Dep. 200–01, 212–13.) Each time a participant purchased additional gold with liquidated gold proceeds, his or her name would again be placed on the list to receive Comp Gold worth 70% of the new amount purchased. Literature provided to potential investors, along with the Training Video, described this convoluted system in detail. *See* Motion, Exs. A, B and C. The Double Eagle Brochure offers the following example of how participants who opted to exercise the "roll-over" option and re-invest (rather than sell) the Comp Gold received from Canyon could receive nearly a 95% return on their investment:

| Purchase | Cash | Complimentary | |
| --- | --- | --- | --- |
| | | **DE** | **ADV** |
| $1000 | | $650 | $350 |
| 700 | | 455 | 245 |
| 500 | −10 | 325 | 175 |
| 300 | 50 | 195 | 105 |
| 200 | 10 | 130 | 70 |
| | 140 | $1755 | 945 |
| | 190 | x.70 (approximate %) | |
| | | $1890 | |
| | | 190 cash | |
| | | −135 processing fee | |
| | | $1945 (approximate) | |

This example shows how your $1000 original purchase turned into $2700 in complimentary gold coins and if you chose to sell them you would have approximately $1945 in cash. One important point: you do not have to sell any gold or sponsor anybody to participate in the Double Eagle and Advantage Program. This is strictly a retail purchase program designed for you, the customer.[12]

Motion, Ex. A, Double Eagle Brochure.

While participants who continued to purchase gold with their proceeds would theoretically earn large profits, many were left with nothing but receipts for Comp Gold. (Huffman Dep. 212.) In actuality, by continuing to roll over the "profits" from their investment into new purchases worth only 70% of the amount rolled over (with the promise of at least a 35% return on the amount reinvested), the participants were cycling their way toward a total loss of their investments. Because Canyon sold non-numismatic gold, the only reason for a purchaser to buy gold from Canyon was the potential receipt of Comp Gold. And, because a buyer of gold from Canyon initially received gold worth only 70% of the purchase price, a purchaser interested in gold as an investment would have received more gold for his/her money from any other coin dealer. (Huffman Dep. 69.)

Canyon only marketed its gold coins through Independent Affiliates ("IAs"), who then sold the coins to other IAs or to non-IA purchasers. A purchaser of gold did not have to be affiliated with Canyon, but to sell gold, and earn cash commissions and additional gold coins, one had to be an IA. To qualify as an IA, a person had to pay Canyon $75 and was required to undergo sales training, which consisted of three parts: attending four training ses-

---

11. The Advantage Brochure contains a nearly identical example, except that the Comp Gold column contains a single reference to $1,000.

12. The Advantage Brochure offers a nearly identical example, the only difference being that the column listing Comp Gold was not divided into "DE" and "ADV" categories.

sions, viewing the Training Video, and passing an examination. Motion, Ex. C, Training Video, Marohl presentation. IAs were encouraged to build a "down-line" of other IAs, each of whom was then to build his or her own down-line. Each IA received a 10% commission on every sale of gold coins to another IA he/she sponsored. Motion, Exs. A and B; Canyon Coin Collectors Affiliates Guide, Marohl Dep., Ex. 5 at 4. The IA also received a 1% "override" on each sale of gold coins by another IA in his or her down-line, down to 10 levels below that of the IA. *Id.* The overrides were paid by way of a voucher redeemable for additional gold coins.

Given its organizational structure and the obligation to pay commissions, overrides and Comp Gold that arose with each purchase, Canyon's liability exceeded the revenue it received on each transaction. For example, in return for a $1,000 purchase, Canyon paid the purchaser $700 in coins, owed a $100 commission to the IA who sold the gold, and owed overrides of between $10 and $100 (depending on the depth of the down-line), to other IAs, leaving between $100 and $190 for Canyon. From this amount, Canyon paid its overhead, including salaries, rent, utilities and other expenses, and had to invest the remaining dollars in a manner that would generate enough funds within 18 months to pay the promised $700 return to the purchaser. (Huffman Dep. 92–100, 243.)

Before founding Canyon, Jack Johnson had been involved in previous unsuccessful coin sales ventures through organizations known as American Coin Collectors and Gold Unlimited. (341 Tr. 71, 105–06, 154; Scott Johnson Dep. 99–100.) Many of the Defendants also were involved on some level with these earlier gold coin sales programs. These programs had rapidly disintegrated, and Jack Johnson ostensibly designed Canyon's business so as to avoid the problems that plagued the earlier ventures. (Scott Johnson Dep. 100; 341 Tr. 154, 160–61, 163–64.) One attempted safeguard was the employment of Attorney Greg Engler to provide an opinion letter stating that Canyon's operation did not constitute a pyramid scheme and did not violate the Ohio Pyramid Sales Act, because fees charged to each new IA did not benefit other IAs. (341 Tr. 35, 160); Engler opinion letter at 1, unnumbered exhibit to Memorandum in Opposition to Motion for Summary Judgment (Doc. 261) filed by the Carmack Defendants, Schraeder and Withrow.

Jack Johnson and Canyon's officers and directors also stressed to investors that Canyon had substantial reserves in the form of real estate and gold. (Training Video, Dennis Walters presentation, Wilkie presentation; 341 Tr. 192–95, 200–05, 273–74; Marohl Dep. 129; Scott Johnson Dep. 108–11; Withrow Dep. 49.) Jack Johnson did in fact own rental properties in the Dayton, Ohio area. The properties were held in his own name and the name of a related entity called Canyon Investments, but the legal work necessary to pledge the properties as a reserve for Canyon was never completed. (341 Tr. 201–03.) The Johnsons' Chapter 7 trustee eventually liquidated these properties for the benefit of their creditors. *See In re Johnson,* Case No. 97–33775, Trustee's Interim Report (Doc. 216). Canyon's financial statements stated—and Jack Johnson routinely told investors and board members—that the company held gold reserves valued at over $1 million. (341 Tr. 166; Scott Johnson Dep. 114; Huffman Dep. 113; Marohl Dep. 26, 71, 114–15.) However, no formal gold reserve account was ever set up. (341 Tr. 194–97.) And, Canyon held no gold in reserve on the Petition Date. (341 Tr. 166, 273–76; Withrow Dep. 49.) Gold coins valued in excess of $1 million, which at one time were held by Canyon, were

liquidated systematically from August 1996 forward in order to enable the Debtor to purchase more gold. The liquidation of this gold was done to buoy confidence in Canyon's sales program because it had the effect of increasing sales volume, thus moving participants' names down the list and triggering more sales. The liquidation created additional liabilities, however, by requiring the payout of more Comp Gold. (341 Tr. 167–69; Scott Johnson Dep. 118–21.)

According to the Defendants, it was bad timing rather than the lack of a legitimate business enterprise that led to Canyon's financial downfall. They allege that because Jack Johnson had hired Marohl to develop new lines of business, and because Marohl had initiated a program to have IAs sell jewelry in addition to gold coins, Canyon was not insolvent on or prior to the Petition Date, but instead had an underlying business that would have generated sufficient cash to pay investors. But the demise of Canyon's coin business occurred when the jewelry sales program was in its nascent stage—Marohl testified in his deposition that the jewelry program was rolled out in April 1997, less than three months before the Petition Date. (Marohl Dep. 68–69, 86.) Thomas Kramer ("Kramer"), a certified public accountant and attorney retained as an expert by the Trustee, prepared a report ("Kramer Report") that included profit and loss statements ("P & Ls") showing that some minimal jewelry sales occurred as early as December 1996. The aggregate amount of jewelry sales over the course of the year Canyon was in business, however, was only $10,259.37, or just 0.03% of Canyon's total income. (Kramer Report, April 1997 P & L.) Jack Johnson and Canyon's board members also discussed creation of a real estate business, an insurance business, a communications business and an art sales business, but none of these plans came to fruition. (341 Tr. 49–50; Marohl Dep. 86–87.)

Most of Canyon's office staff was comprised of Jack Johnson's family members. His son, Scott Johnson, was Canyon's Vice President of Sales. (Scott Johnson Dep. 102.) Scott's wife, Patricia, worked in Canyon's office answering phones and filing. (Patricia Johnson Dep. 24, 27–28, 39.) Jack Johnson's two step-daughters, Withrow and Schraeder, and his daughters Cindy Ball and Julia Carmack, and Julia's husband, Jeffrey Carmack, also worked for Canyon. (341 Tr. 40–41, 44, 109, 111; Patricia Johnson Dep. 42; Withrow Dep. 9–10, 29, 31–33, 35.) When Canyon's gold coin sales programs were set up, Jack Johnson placed himself at the top of the sales pyramid, his son Scott as the first IA, and his two daughters and two step-daughters at the top of the other IA lines, so that the sales generated by all later IAs resulted in payment of commissions and overrides to his family members. (341 Tr. 109–10, 140–47; Withrow Dep. 114–23; Marohl Dep. 130–34.)

## IV. Legal Analysis

### A. Summary Judgment Standard

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c) (made applicable in these adversary proceedings by Fed. R. Bankr.P. 7056). On motion for summary judgment, the inferences drawn from the underlying facts must be viewed in the light most favorable to the non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Anthony v. BTR Auto. Sealing Sys., Inc.*, 339

F.3d 506, 511 (6th Cir.2003); *McKenzie v. BellSouth Telecomms., Inc.*, 219 F.3d 508, 512 (6th Cir.2000). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Leary v. Daeschner*, 349 F.3d 888, 897 (6th Cir.2003); *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir.1989). Once the moving party satisfies its burden, the non-moving party must then "come forward with 'specific facts showing that there is a *genuine issue for trial.*'" *Matsushita*, 475 U.S. at 587, 106 S.Ct. 1348 (quoting Fed.R.Civ.P. 56(e)); *Lanier v. Bryant*, 332 F.3d 999, 1003 (6th Cir.2003); *McKenzie*, 219 F.3d at 512. The non-moving party may not meet this burden by resting on mere allegations in the pleadings. *See* Fed.R.Civ.P. 56(e); *Celotex*, 477 U.S. at 324, 106 S.Ct. 2548; *Mounts v. Grand Trunk W.R.R.*, 198 F.3d 578, 580 (6th Cir.2000). "Merely alleging the existence of a factual dispute is insufficient to defeat a summary judgment motion; rather, there must exist in the record a genuine issue of material fact." *McKenzie*, 219 F.3d at 512 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). A material fact is one that has the "potential to affect the outcome of the suit under applicable law." *FDIC v. Anchor Props.*, 13 F.3d 27, 30 (1st Cir.1994) (citations and internal quotation marks omitted). "As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505. *See also Niecko v. Emro Mktg. Co.*, 973 F.2d 1296, 1304 (6th Cir.1992).

## B. The Trustee's Fraudulent Transfer Claims

The Trustee asserts that Canyon's transfers of cash and gold coins to the Defendants in amounts exceeding their original investment—the so-called false profits—are subject to avoidance as both actual and constructive fraudulent transfers. He brings the avoidance claims under both § 548 of the Code and the Ohio UFTA (exercising his "strong-arm" powers under § 544(b) of the Code). The Trustee's claims are premised upon his contention that the transfers of false profits to the Defendants were made by Canyon in furtherance of a Ponzi scheme. Thus, the Court will first address the issue of whether Canyon's gold coin sales business was in fact a Ponzi scheme.

### 1. Ponzi Scheme

The Trustee asserts that Canyon's gold coin sales programs constituted a Ponzi scheme that operated for approximately 14 months—from May 1996 to the Petition Date. A Ponzi scheme is a fraudulent investment arrangement under which an entity makes payments to investors from monies received from new investors rather than from profits generated by legitimate business operations, although investors may believe an actual business exists from which profits are derived. *See, e.g., First Nat'l Bank of Barnesville v. Rafoth (In re Baker & Getty Fin. Servs., Inc.)*, 974 F.2d 712, 714 (6th Cir.1992); *Wyle v. C.H. Rider & Family (In re United Energy Corp.)*, 944 F.2d 589, 590 n. 1 (9th Cir.1991) ("A Ponzi scheme is a fraudulent arrangement in which an entity makes payments to investors from monies obtained from later investors rather than from any 'profits' of the underlying business venture. The fraud consists of funnelling proceeds received from new investors to previous investors in the guise of

profits from the alleged business venture, thereby cultivating an illusion that a legitimate profit-making business opportunity exists and inducing further investment."); *Bauman v. Bliese (In re McCarn's Allstate Fin., Inc.)*, 326 B.R. 843, 845 (Bankr. M.D.Fla.2005) ("A 'Ponzi scheme' is a fraudulent investment arrangement in which returns to investors come from monies obtained from new investors rather than an underlying business enterprise."); *Fisher v. Sellis (In re Lake States Commodities, Inc.) ("Lake States I")*, 253 B.R. 866, 869 n. 2 (Bankr.N.D.Ill.2000); *Flatau v. Madonian (In re Sheetex, Inc.)*, 1999 WL 739628, at *2 (Bankr.M.D.Ga. Sept. 21, 1999); *In re Taubman*, 160 B.R. 964, 978 (Bankr.S.D.Ohio 1993).[13] Typically, Ponzi scheme investors are promised high rates of return on their investments. *Taubman*, 160 B.R. at 978. Early investors actually receive the promised returns, creating the impression of a legitimate, or at least profitable, business, and thereby enticing new investors into the plan. *See id.* But "[a]s a result of the absence of sufficient, or any, assets able to generate funds necessary to pay the promised returns, the success of such a scheme guarantees its demise because the operator must attract more and more funds, which thereby creates a greater need for funds to pay previous investors, all of which ultimately causes the scheme to collapse." *Id.*

A pyramid scheme is similar to a Ponzi scheme, the difference being that investors in a pyramid scheme expect "to profit from their efforts at obtaining new people to invest in the business into which they have already invested their own money[,]" rather than from the business itself. *Sheetex*, 1999 WL 739628, at *2. "In both Ponzi schemes and pyramid schemes, the supply of subsequent investors is eventually exhausted and the scheme collapses, with the later investors typically losing all of the money that they invested, and only the earliest investors, if any at all, will have recovered their investments." *Id.*

To prove that Canyon engaged in a Ponzi scheme, the Trustee must establish that: (1) deposits were made by investors; (2) the Debtor conducted little or no legitimate business operations as represented to investors; (3) the purported business operations of the Debtor produced little or no profits or earnings; and (4) the source of payments to investors was from cash infused by new investors. *Fisher v. Sellas (In re Lake States Commodities, Inc.) ("Lake States II")*, 272 B.R. 233, 242 (Bankr.N.D.Ill.2002) (citing *Floyd v. Dunson (In re Ramirez Rodriguez)*, 209 B.R. 424, 431 (Bankr.S.D.Tex.1997)), *aff'd sub nom. Fisher v. Page*, 2002 WL 31749262 (N.D.Ill. Dec. 3, 2002).

Here, there is no question that investors made deposits with the Debtor.

---

**13.** A "Ponzi scheme" derives its name from a fraudulent investment arrangement masterminded by Charles Ponzi in the 1920s. Ponzi's plan, promising a 50% return on 45-day notes, collapsed when he was unable to repay investors. A post-bankruptcy accounting examination of his books and records revealed that Ponzi had never made any investments with his participants' money, but had merely paid early investors with funds received from later investors. *Merrill v. Abbott (In re Indep. Clearing House Co.)*, 41 B.R. 985, 994 n. 12 (Bankr.D.Utah 1984), *aff'd in part, rev'd in part on other grounds sub nom. Merrill v. Dietz (In re Universal Clearing House Co.)*, 62 B.R. 118 (D.Utah 1986) *and aff'd in part, rev'd in part on other grounds sub nom. Merrill v. Abbott (In re Indep. Clearing House Co.)*, 77 B.R. 843 (D.Utah 1987) (en banc). *See also Kipperman v. Circle Trust F.B.O. (In re Grafton Partners, L.P.)*, 321 B.R. 527, 530 n. 2 (9th Cir. BAP 2005) ("The term 'Ponzi scheme' is the legacy of what Chief Justice Taft described as 'the remarkable criminal financial career of Charles Ponzi.'" (quoting *Cunningham v. Brown*, 265 U.S. 1, 7, 44 S.Ct. 424, 68 L.Ed. 873 (1924))).

In its bankruptcy schedules, the Debtor listed over 2,800 investors, spread over 30 states, holding claims in excess of $7.5 million. (341 Tr. 6.) Canyon promised these investors, through its Double Eagle and Advantage Brochures, its Training Video, and by presentations from IAs to potential purchasers, that not only would they be made whole, but that they could earn up to a 35% return on a one-time purchase of gold coins, and far more if the investor rolled over "profits" and made additional coin purchases. Canyon also promised IAs that they would receive commissions and overrides on sales by those in their down-lines. *See* Motion, Exs. A, B and C. Yet Canyon had no business that could generate these returns or pay these obligations. Its only business was the constant turnover of coins by purchasers who would pay for coins, receive coins, sell the coins back, use the proceeds to buy more coins, and so on. As aptly described by the Trustee in the deposition of Lee Ann Zavakos ("Zavakos"), a certified public accountant who was retained as the Defendants' expert witness, "[Canyon's 'business' was a] program where you buy, sell, buy, sell until you cycle yourself down from the original gold to a couple [of] pennies and a bunch of receipts for comp gold." (Zavakos Dep. 86.) Canyon's operations did not generate profits, but instead piled up liabilities for the company. The parties' respective expert witnesses—Kramer and Zavakos—agreed that the coin business was not profitable and, as configured, could never become profitable.

In Kramer's analysis of Canyon's gold coin sales program,[14] he concluded that

[t]he Programs were devices aimed at generating cash for the enterprise without any potential for profit generation. Canyon's business model was devoid of economic substance and insured an eventual collapse of the enterprise once the finite supply of participants willing to provide funding for the scheme was exhausted. A viable enterprise cannot be built by taking an unprofitable model and duplicating it numerous times. The whole objective of this scheme was to induce participants to give the enterprise money and fuel future participation through the recycling of gold under the "aggressive" program (as described in the Brochures and in the Video) and through the participation of others, in the hope that the participant's name would move [down] the ladder quicker and enable them to share in "complimentary" gold. In sum and substance, the Programs amounted to nothing more than an opportunity to deposit a sum of money with the enterprise, receive a portion of that money back, and have the remainder of the funds expended for the benefit of other participants in the hope that the participant's name would move [down] the list so that the participant could some day share in other participant's [sic] money.

(Kramer Aff. ¶ 7.)

In response to questioning from Rieser regarding Kramer's conclusions, Zavakos testified:

> RIESER: Okay. Now, let's go to page 8 of his opinion letter.
>
> ZAVAKOS: Uh-huh.

14. Kramer prepared both an affidavit ("Kramer Aff."), which is attached as Exhibit E to the Motion, and a nine-page opinion letter addressed to Rieser, which was presented to Zavakos as an exhibit during her deposition. The opinion letter is attached as an exhibit to Zavakos's deposition transcript. The conclusions set forth in the opinion letter and affidavit are virtually identical, although the opinion letter incorporates supporting charts that are not attached to the affidavit.

RIESER: The first sentence of the full paragraph beginning ["B]ased on the foregoing, I have developed a professional opinion that debtor's gold coin program[s] as described above were devices aimed solely at generating cash for the enterprise without any potential for profit generation[,]["] [d]o you agree with that statement as it is presented in his report?

ZAVAKOS: I do so long as it's pertaining only to the gold program.

RIESER: And it says gold coin program.

ZAVAKOS: Right.

RIESER: So you have no quarrel with him on the gold portion as opposed to the jewelry portion?

ZAVAKOS: Correct.

RIESER: The second sentence of that paragraph says ["A]s such[,] debtor's business model was devoid of economic substance and insured an eventual collapse of the enterprise once the finite supply of participants willing to provide funding for the scheme was exhausted.["] Do you agree with that statement as it pertains to the gold coin program?

ZAVAKOS: If you assume that the debtor's business model only included the gold coins, then that would be a correct statement. My understanding was that it included other programs.

RIESER: If you assume, based on the documents that you reviewed, that those other programs consisted of essentially some $20,000 total of jewelry in fact and you ignore what could have, would have, should have, might have been, but in fact, what was sold, do you agree with the statement?

ZAVAKOS: Yes.

(Zavakos Dep. 86–88.)

The Trustee has met his burden of establishing that Canyon was engaged in a Ponzi scheme from May 1996 through the Petition Date. The undisputed evidence establishes the existence of each of the four elements of a Ponzi scheme identified by the *Lake States I* and *Ramirez Rodriguez* courts. There is no dispute that deposits were made to Canyon by investors. As the Motion states—and Defendants do not dispute—Canyon's sales, which were, in effect, deposits by participants, amounted to nearly $33 million. (Motion at 6.) While Canyon was engaged in the business of buying and selling gold coins, it did so in a manner that guaranteed its demise. And its other line of business—jewelry sales—generated minimal revenue. Although Defendants suggest that Canyon sold, or would in the future sell, a sufficient amount of jewelry to negate the impact of the gold coin losses, there is not a shred of evidence to support their position. Both experts agreed that the jewelry business yielded negligible returns—Kramer documented that jewelry sales represented less than one percent of Canyon's total income. Because the gold coin programs generated no profits for the company—a point upon which both experts agree—Canyon had no identifiable source of capital it could draw on to purchase jewelry for resale. Thus, contrary to its representations to participants, Canyon conducted no legitimate business operations. Nor is there any dis-

pute that Canyon's business operations failed to generate any profits. Finally, there was no identifiable source of payments to participants other than infusions of cash from later participants. In sum, Canyon's gold coin sales programs had all of the hallmarks of a classic Ponzi scheme.

To attempt to refute the existence of a Ponzi scheme, Defendants raise several arguments, none of which are meritorious. Defendants first argue that Jack Johnson planned to expand Canyon's operations to include other lines of business. According to Defendants, the gold coin sales programs represented only the first stage of Canyon's business plan. They point out that Jack Johnson envisioned the company branching into jewelry and art sales, real estate, insurance and communications, and the gold coin programs were designed to raise the seed money for these other ventures. But, with the exception of Canyon's jewelry sales program—which was rolled out only a few months prior to the Petition Date, *see* Marohl Dep. 68–69, 86, and generated only minimal revenue—these other businesses never got off the ground. As previously noted, more than 99% of Canyon's total revenue came from its gold coin programs. Despite Defendants' suggestion to the contrary, Canyon's business activities were utterly devoid of legitimacy.

Equally unavailing is the Defendants' claim that Canyon was not engaged in a Ponzi scheme because the company did not actually *promise* to return any more than a participant's original investment. Defendants point to language contained in purchase orders signed by purchasers of gold coins stating:

> Buyer has been advised the Company will issue complimentary gold coins based on the sales volume originated by Independent Affiliates and received by Company. Neither Company nor Independent Affiliates can determine when complimentary gold coins will be issued; however, Company intends to issue complimentary gold within 18 months from the acceptance of the Purchase Order in an amount that makes the person whole for their original purchase (Wholesale value of complimentary gold added to wholesale value of gold previously supplied is approximately equal to purchase price excluding tax and shipping/handling fee).

(Scott Johnson Dep., Ex. 5, Double Eagle Advantage Program Purchase Order ¶ 8.) This argument is unpersuasive for several reasons. First, Canyon also used a different version of the purchase order form, which did not contain the limiting language quoted above. This alternative version of the purchase order form stated: "Neither Company nor its Independent Affiliate can determine when complimentary gold coins will be issued or in what amount, but *no longer than eighteen (18) months from the date purchase [sic]."* (*Id.,* Ex. 5, Advantage Program Purchase Order ¶ 8 (emphasis added)). Second, there was no hint of equivocation in Canyon's marketing materials. Indeed, both the Double Eagle and Advantage Brochures expressly stated that Comp Gold would be paid, and neither brochure suggested that Canyon's obligation was limited to making investors whole—that is, issuing only so much Comp Gold to an investor as would return his/her original investment. *See* Double Eagle Brochure, Motion, Ex. A ("For each purchase, no matter what amount, [Canyon] *guarantees* that you will receive complimentary gold." (emphasis added)); Advantage Brochure, Motion, Ex. B ("For each purchase you will receive complimentary gold."). Hence, the suggestion that Canyon's gold coin sales programs were based on a promise to do nothing more than return a participant's initial investment within 18 months of his/her purchase flies in the face of the evidentiary record and

defies common sense. When Canyon's marketing materials—including the brochures and the Training Video—are examined in their entirety, it is readily apparent that the company induced investors to purchase gold coins with the *promise* of exorbitant returns. *See, e.g.,* Example from Double Eagle and Advantage Brochures set forth, *supra,* at 12 (illustrating how $1,000 investment would yield a $1,950 return). In sum, based on the undisputed evidence of record, there is no doubt that Canyon's "business" was a Ponzi scheme.

### 2. The Actual Fraudulent Transfer Claims

#### a. Transfer of an Interest of the Debtor in Property

The Trustee asserts that he may avoid all transfers of false profits to the Defendants made within one year of the Petition Date under § 548(a)(1)(A) of the Bankruptcy Code and the actual fraudulent transfer provisions of the Ohio UFTA.[15] *See* 11 U.S.C. § 548(a)(1)(A); Ohio Rev. Code Ann. § 1336.04(A).

Section 548(a)(1)(A) of the Bankruptcy Code provides:

(a)(1) The trustee may avoid any transfer of an interest of the debtor in property, or any obligation incurred by the debtor, that was made or incurred on or within one year before the date of the filing of the petition, if the debtor voluntarily or involuntarily—

(A) made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted[.]

11 U.S.C. § 548(a)(1)(A).

Section 1336.04(A)(1) of the Ohio Revised Code provides:

(A) A transfer made or an obligation incurred by a debtor is fraudulent as to a creditor, whether the claim of the creditor arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation in either of the following ways:

(1) With actual intent to hinder, delay, or defraud any creditor of the debtor . . . .

Ohio Rev.Code Ann. § 1336.04(A)(1).

■ To establish an actual fraudulent transfer under the Code and the Ohio UFTA, the Trustee must first demon-

---

**15.** Ohio Rev.Code Ann. §§ 1336.01–1336.11 (LexisNexis 2002). Ohio repealed and replaced the Uniform Fraudulent Conveyance Act ("UFCA") with the UFTA in September 1990. Similar policies underlie these two uniform acts; thus, the Court relies on case law interpreting both the UFCA and the UFTA. The Trustee may assert his claims under the UFTA pursuant to § 544(b) of the Code (set forth and discussed *infra* at 61–62).

The fraudulent transfer provisions of the Code and the UFTA are substantially similar. *See, e.g., Daly v. Deptula (In re Carrozzella & Richardson),* 286 B.R. 480, 483 n. 3 (D.Conn. 2002) ("[T]he basic principles governing fraudulent transfer actions are the same, regardless of the statutory basis used."); *Levit v. Spatz (In re Spatz),* 222 B.R. 157, 164 (N.D.Ill.

1998) ("Because the provisions of the UFTA parallel § 548 of the Bankruptcy Code, findings made under the Bankruptcy Code are applicable to actions under the UFTA."); *Ramirez Rodriguez,* 209 B.R. at 433 n. 1 ("The UFTA closely parallels the actual and constructive fraudulent transfer provisions . . . of the Bankruptcy Code. . . ."). The primary distinction among the provisions for purposes of the present case is the applicable "reachback" period. The Code allows avoidance of only those fraudulent transfers made within one year prior to the Petition Date. *See* 11 U.S.C. § 548(a)(1). In contrast, the Ohio UFTA provides that fraudulent transfers may be avoided up to four years after the date of the transfer. *See* Ohio Rev.Code Ann. § 1336.09(A) and (B).

strate that the Debtor had an interest in the property transferred to the Defendants. 11 U.S.C. § 548(a)(1). Section 101(54) of the Code provides, in relevant part, that " 'transfer' means every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with property or with an interest in property, including retention of title as a security interest and foreclosure of the debtor's equity of redemption[.]" 11 U.S.C. § 101(54). The definition of transfer under the Ohio UFTA is substantially similar: " 'Transfer' means every direct or indirect, absolute or conditional, and voluntary or involuntary method of disposing of or parting with an asset or an interest in an asset, and includes payment of money, release, lease, and creation of a lien or other encumbrance." Ohio Rev.Code Ann. § 1336.01(L).

■ Payments made to investors in a Ponzi scheme constitute "transfers" within the meaning of both § 101(54) of the Code and § 1336.01(L) of the Ohio UFTA. *Taubman*, 160 B.R. at 982–83. Further, a Ponzi scheme operator possesses a property interest in the transferred funds. *See, e.g., Ramirez Rodriguez*, 209 B.R. at 432 ("Funds obtained from investors in a Ponzi scheme are property of debtor, and are thus susceptible to preferential and fraudulent disposition by debtor."); *Jobin v. Lalan (In re M & L Bus. Mach. Co.)*, 160 B.R. 851, 857 (Bankr.D.Colo.1993), *aff'd*, 167 B.R. 219 (D.Colo.1994) ("There is no argument but that the investors gave their money to the Debtor voluntarily. Thus, at the time of each investment, the Debtor had at least the legal right to possession. It is elemental property law that one of the 'interests in property' included in the total bundle of property rights is the right of possession. All that § 548 requires is the transfer of an 'interest' by the Debtor."); *Indep. Clearing House*, 77 B.R. at 854

("[W]hen a debtor obtains money by fraud and mingles it with other money so as to preclude any tracing and when the defrauded party ... accepts benefits under his contract with the debtor, the money is 'property' of the debtor within the meaning of section[ ] ... 548 of the Code."). The Court accordingly finds that the funds transferred to investors by Canyon constitute transfers of an interest of a debtor in property. 11 U.S.C. §§ 544(b)(1), 548(a)(1); Ohio Rev.Code Ann. §§ 1336.01(L).

### b. Actual Intent to Hinder, Delay or Defraud Creditors

■■ To set aside the transfers of cash and Comp Gold as actual fraudulent transfers, the Trustee must establish that they were made with the "actual intent to hinder, delay, or defraud" the Debtor's creditors. 11 U.S.C. § 548(a)(1)(A); Ohio Rev. Code Ann. § 1336.04(A)(1). Under the Ohio UFTA, intent to hinder, delay or defraud creditors must be established by clear and convincing evidence. *See, e.g., United States v. Smith*, 2002 WL 31174188, at *5 (S.D.Ohio Aug. 23, 2002); *Kandel v. Shanklin (In re Shanklin)*, 1995 WL 33473, at *2 (Bankr.N.D.Ohio Jan. 6, 1995); *Wagner v. Galipo*, 97 Ohio App.3d 302, 646 N.E.2d 844, 848 (1994). Courts are split as to the standard of proof a bankruptcy trustee must meet in an action to avoid a transfer under § 548(a)(1)(A) of the Code. *Compare Silagy v. Gagnon (In re Gabor)*, 280 B.R. 149, 155 (Bankr. N.D.Ohio 2002) (trustee must meet preponderance-of-the-evidence standard in actual fraudulent transfer action); *Dev. Specialists, Inc. v. Hamilton Bank, N.A. (In re Model Imperial, Inc.)*, 250 B.R. 776, 790–91 (Bankr.S.D.Fla.2000) (same) *and Breeden v. L.I. Bridge Fund, LLC (In re Bennett Funding Group, Inc.)*, 232 B.R. 565, 570 (Bankr.N.D.N.Y.1999) (same) *with Morse Operations, Inc. v. Goodway*

*Graphics of Virginia, Inc. (In re Lease–A–Fleet, Inc.)*, 155 B.R. 666, 674 (Bankr. E.D.Pa.1993) (clear-and-convincing standard applies in § 548(a)(1)(A) cases) *and Bumgardner v. Ross (In re Ste. Jan–Marie, Inc.)*, 151 B.R. 984, 987 (Bankr. S.D.Fla.1993) (same). *See also Taylor v. Rupp (In re Taylor)*, 133 F.3d 1336, 1338 (10th Cir.1998) (noting the split of authority); David B. Young, *Preferences and Fraudulent Transfers*, 876 PLI/Comm 667, 803–04 (2005) ("The strong current of opinion now holds that actual intent under 11 U.S.C. § 548(a)(1)(A) need only be shown by a preponderance of the evidence.... A minority of courts, however, have continued to adhere to the clear and convincing standard in Section 548(a)(1)(A) cases."). Here, it is not necessary to determine whether the preponderance or clear-and-convincing evidentiary burden applies in the context of a § 548(a)(1)(A) case because, as discussed above, the Trustee has established the existence of a Ponzi scheme, and thus actual intent to defraud, by clear and convincing evidence.[16]

 A finding of intent to hinder, delay or defraud creditors may be made on the basis of circumstantial evidence, as direct proof of the debtor's fraudulent intent will rarely be available. *United States v. Rosen*, 130 F.3d 5, 9 (1st Cir. 1997); *United States v. Coppola*, 85 F.3d

1015, 1021–22 (2d Cir.1996); *Gabor*, 280 B.R. at 157 ("Fraudulent intent is rarely proved by direct evidence."); *Stein v. Brown*, 18 Ohio St.3d 305, 480 N.E.2d 1121, 1124 (1985). Because the Debtor's subjective intent is in issue, summary judgment is generally not an appropriate mechanism for adjudication of an actual fraudulent transfer claim. *See Osherow v. Porras (In re Porras)*, 312 B.R. 81, 105 (Bankr.W.D.Tex.2004) (denying summary judgment on trustee's actual fraudulent transfer claim and noting that "court is reluctant to find intent to hinder, delay or defraud as a matter of law"); *IDS Holding Co. v. Madsen (In re IDS Holding Co.)*, 292 B.R. 233, 236–37 (Bankr.D.Conn.2003) (denying summary judgment on § 548(a)(1)(A) claim because "[s]ummary judgment is notoriously inappropriate for determination of claims in which issues of intent, good faith and other subjective determinations play dominant roles" (citation and internal quotation marks omitted)); *Novak v. Blonder (In re Blonder)*, 246 B.R. 147, 151 (Bankr.D.Conn.2000) ("[A] determination as to whether property was transferred with actual intent to hinder ... creditors involves issues of intent and credibility that were inappropriate for summary judgment...." (internal quotation marks omitted)).

Actual intent to hinder, delay or defraud may be established as a matter of law in

---

**16.** In *Grogan v. Garner*, 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991), the Supreme Court held that the preponderance-of-the-evidence standard applies in a § 523(a)(2)(A) action to declare a debt nondischargeable based on the debtor's actual fraud. Although the *Garner* decision did not address the evidentiary standard governing actions brought under § 548(a)(1)(A), "the Supreme Court held that the preponderance standard applies to all causes of action arising under the Bankruptcy Code 'unless particularly important individual interests or rights are at stake.'" *Baldi v. Lynch (In re McCook Metals, L.L.C.)*, 319 B.R. 570, 587 n. 11 (Bankr.

N.D.Ill.2005) (quoting *Garner*, 498 U.S. at 286, 111 S.Ct. 654). Thus, many of the cases that follow the majority rule and hold that the preponderance standard applies in the context of a § 548(a)(1)(A) action rely on *Garner* to reach that result. *See, e.g., Baldi*, 319 B.R. at 587 n. 11 ("There is no apparent reason for treating the interests of a defendant in an actual fraud proceeding under § 548(a)(1) as more important than the interests at stake in Garner—the dischargeability of debt under § 523(a)(2)."); *Torgenrud v. Benson (In re Wolcott)*, 194 B.R. 477, 485 (Bankr.D.Mont. 1996).

cases in which the debtor runs a Ponzi scheme or a similar illegitimate enterprise, because transfers made in the course of a Ponzi operation could have been made for no purpose other than to hinder, delay or defraud creditors. Thus, "bankruptcy [and other] courts nationwide have recognized that establishing the existence of a Ponzi scheme is sufficient to prove a Debtor's actual intent to defraud." *Bauman*, 326 B.R. at 850. *See also Conroy v. Shott*, 9 Ohio Misc. 117, 363 F.2d 90, 91–92 (6th Cir.1966) (quoting with approval the opinion of the district court granting a trustee's motion for summary judgment and concluding that "the question of intent to defraud is not debatable" given the fact that the debtor was engaged in a Ponzi scheme); *Emerson v. Maples (In re Mark Benskin & Co.)*, 59 F.3d 170, 1995 WL 381741, at *5 (6th Cir. June 26, 1995) ("Since 1966, this court has found that the question of intent to defraud in a Ponzi scheme is not debatable." (internal quotation marks omitted)); *Liebersohn v. Campus Crusade for Christ, Inc. (In re C.F. Foods, L.P.)*, 280 B.R. 103, 110 (Bankr. E.D.Pa.2002) ("Numerous courts have decided that a debtor's actual intent to hinder, delay or defraud creditors may be inferred from the Debtor's active participation in a Ponzi scheme."); *Cuthill v. Greenmark, LLC (In re World Vision Entm't, Inc.)*, 275 B.R. 641, 656 (Bankr. M.D.Fla.2002) ("A Ponzi scheme is by definition fraudulent.... Every payment made by the debtor to keep the scheme on-going was made with the actual intent to hinder, delay, or defraud creditors, primarily the new investors."); *M & L Bus. Mach.*, 160 B.R. at 857 ("[I]n a Ponzi scheme the only inference that a court can make is that the Debtor had the requisite intent to hinder, delay or defraud under § 548(a)(1)."); *Indep. Clearing House*, 77 B.R. at 860 ("One can infer an intent to defraud future [participants] from the mere fact that a debtor was running a Ponzi scheme. Indeed, no other inference is possible.... The [debtor] must know all along, from the very nature of his activities, that investors at the end of the line will lose their money. Knowledge to a substantial certainty constitutes intent in the eyes of the law, and a debtor's knowledge that future investors will not be paid is sufficient to establish his actual intent to defraud them." (citation omitted)).

In sum, transfers made to investors in furtherance of a Ponzi scheme are deemed to have been made with actual intent to hinder, delay or defraud creditors. Having concluded that Canyon was actively engaged in a Ponzi scheme, the Court finds as a matter of law that the transfers of the Debtor's cash and gold to the Defendants were made with actual intent to hinder, delay or defraud creditors. The transfers are therefore avoidable under both § 548(a)(1)(A) of the Bankruptcy Code and Ohio Revised Code § 1336.04(A)(1).

### 3. The Constructive Fraudulent Transfer Claims

### a. The Constructive Fraud Provisions of the Bankruptcy Code and the Ohio UFTA

The Trustee also asserts that the transfers of gold and cash to the Defendants are avoidable as constructive fraudulent transfers under both the Code and the UFTA. Section 548(a)(1)(B), the Bankruptcy Code's constructive fraud provision, provides:

(a)(1) The trustee may avoid any transfer of an interest of the debtor in property, or any obligation incurred by the debtor, that was made or incurred on or within one year before the date of the filing of the petition, if the debtor voluntarily or involuntarily—

(B)(i) received less than a reasonably equivalent value in exchange for such transfer or obligation; and

(ii) (I) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;

(II) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital; or

(III) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured.

11 U.S.C. § 548(a)(1)(B).

The relevant provisions of the Ohio UFTA are nearly identical, except that they do not limit the reach-back period to one year. Ohio Revised Code § 1336.04(A)(2) provides:

(A) A transfer made or an obligation incurred by a debtor is fraudulent as to a creditor, whether the claim of the creditor arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation in either of the following ways:

(2) Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and if either of the following applies:

(a) The debtor was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction;

(b) The debtor intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due.

Ohio Rev.Code Ann. § 1336.04(A)(2). And Ohio Revised Code § 1336.05(A) states:

(A) A transfer made or an obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

Ohio Rev.Code Ann. § 1336.05(A).

Thus, to prevail on his constructive fraud claims, the Trustee must establish by a preponderance of the evidence that Canyon received less than reasonably equivalent value in exchange for the challenged transfers and also must demonstrate at least one of the following: (1) that Canyon was insolvent on the date the transfers were made or became insolvent as a result of the transfers; (2) that Canyon was engaged in business or a transaction for which its property remaining after the transfers was an unreasonably small capital; or (3) that Canyon intended to incur, or believed that it would incur, debts beyond its ability to repay.[17] *See* 11 U.S.C. § 548(a)(1)(B); Ohio Rev.Code Ann. §§ 1336.04(A)(2) and 1336.05(A). The Court will first address the question of whether the transfers challenged by the Trustee were supported by an exchange of reasonably equivalent value and then turn to an examination of the Debtor's financial

**17.** The parties do not dispute the existence of creditors whose claims arose before the transfers challenged by the Trustee. Thus, the Trustee may seek avoidance of Canyon's transfers of cash and Comp Gold under Ohio Revised Code § 1336.04(A)(2) or § 1336.05(A).

condition at the time of and following the transfers in question.

### b. Transfers for Less than Reasonably Equivalent Value

■■■■■ "A fundamental element of a constructive fraudulent transfer claim is a transfer made in exchange for less than reasonably equivalent value." *Corzin v. Fordu (In re Fordu)*, 201 F.3d 693, 707 (6th Cir.1999). *See* 11 U.S.C. § 548(a)(1)(B)(i); Ohio Rev.Code Ann. §§ 1336.04(A)(2) and 1336.05(A). In determining whether a challenged transfer is supported by reasonably equivalent value, courts generally compare the value of the property transferred with the value of that received in exchange for the transfer. *See, e.g., Aristocrat Lakewood Nursing Home v. Mayne*, 133 Ohio App.3d 651, 729 N.E.2d 768, 778 (1999) (where transferor "gave up a certain asset of $7,500" in return for "a highly contingent potential opportunity to rent a home" from the transferee, "record does not show that [transferor's] benefit was reasonably equivalent to the value [he] surrendered...."); *Deitering v. Amann*, 1992 WL 127654, at *2 (Ohio Ct.App. June 11, 1992) (analyzing reasonable equivalency by comparing value of property transferred and amount received by transferor). *See also Barber v. Golden Seed Co., Inc.*, 129 F.3d 382, 387 (7th Cir.1997) ("The test used to determine reasonably equivalent value in the context of a fraudulent conveyance requires the court to determine the value of what was transferred and compare it to what was received." (citing *Matter of Vitreous Steel Prods. Co.*, 911 F.2d 1223, 1235–36 (7th Cir.1990))). In determining reasonable equivalency, value must be measured from the standpoint of the debtor. *See Aristocrat Lakewood Nursing Home*, 729 N.E.2d at 777–78 (citing *SPC Plastics Corp. v. Griffith (In re Structurlite Plastics Corp.)*, 193 B.R. 451, 456 (Bankr.S.D.Ohio 1995), *aff'd in part*,

*rev'd in part*, 224 B.R. 27 (6th Cir. BAP 1998)).

As the district court noted in *Daly v. Deptula (Carrozzella & Richardson)*, 286 B.R. 480, 487 (D.Conn.2002) "[t]here is sharp split of authority on the issue of whether the payment of interest [or some other form of return to a Ponzi scheme investor] by a Ponzi scheme operator can ever constitute reasonably equivalent value." 286 B.R. at 487. Describing the legal reasoning supporting the first line of authority, which holds that any transfer by a debtor to a Ponzi scheme investor over and above the amount of the transferee's initial investment is not, *as a matter of law*, supported by reasonably equivalent value, the *Carrozzella & Richardson* court explained:

> [One] line of cases ... analyze[s] the issue of whether reasonably equivalent value has been received by a debtor in a Ponzi scheme by beginning with ... [the following] established principle[ ] of Ponzi scheme jurisprudence: when facing fraudulent conveyance actions, investors may keep the principal amount of their investments, but they may not keep any profits from the scheme. The rationale is that to allow the investors in these fraudulent schemes to keep payments in excess of their actual investments would ... allow them to profit at the expense of those investors who entered the scheme later and received nothing. The next step in determining whether the debtor received value for the transfer is to assess the bargain that the debtor made which gave rise to his liability to his creditors. Since the debtor's liability for the payments arose under whatever agreement it made with each of the investors, whether the debtor was really indebted to the investors depends on whether or not they had a valid, enforceable right under their agreement to re-

ceive the payments. These cases have then held that the contract between the Ponzi scheme principal and investors is not enforceable in excess of the amounts invested because the contract underlying the transaction is illegal and, therefore, no value could have been given by the transferee to the debtor for the transfer. The cases have emphasized that "value" must be viewed from an objective standpoint and that, if use of the investors' money was of "value" to the debtor, the only "value" was to perpetuate the Ponzi scheme. Therefore, the "value" of that money, if anything, was "negative value." Further, by helping the debtor perpetuate his illegal scheme, the transfers between the debtor and investors only exacerbated the harm to the debtor's creditors by increasing the amount of claims, while diminishing the debtor's estate. . . .

*Id.* at 487–88 (citations and quotation marks omitted). Decisions following this rationale include the two leading Ponzi scheme cases from this district—*Taubman* and *Noland v. Morefield (In re National Liquidators, Inc.)*, 232 B.R. 915, 919 (Bankr.S.D.Ohio 1998). *See also Warfield v. Byron*, 436 F.3d 551, 560 (5th Cir.2006); *Sender v. Buchanan (In re Hedged–Invs. Assocs., Inc.)*, 84 F.3d 1286, 1290 (10th Cir.1996); *Indep. Clearing House*, 77 B.R. 843, 858–59; *Ramirez Rodriguez*, 209 B.R. at 434; *Martino v. Edison Worldwide Capital (In re Randy)*, 189 B.R. 425, 438–39 (Bankr.N.D.Ill.1995); *Dicello v. Jenkins (In re Int'l Loan Network, Inc.)*, 160 B.R. 1, 16 (Bankr.D.D.C.1993).

Relying on the legal rationale described above by the *Carrozzella & Richardson* court—and, specifically, the *Taubman* case—the Trustee maintains that the Court should determine as a matter of law that Defendants failed to provide reasonably equivalent value to the Debtor in exchange for the challenged transfers.

According to the Trustee, the only thing Canyon received in return for its payment of Comp Gold and/or commissions and overrides to the Defendants was money and/or services that Canyon used to perpetuate its illegal Ponzi scheme and thereby incur even greater liabilities—or, in the words of the *Carrozzella & Richardson* and *Taubman* courts, "negative value." *Carrozzella & Richardson*, 286 B.R. at 488; *Taubman*, 160 B.R. at 986.

Not surprisingly, the Defendants urge the court to follow the competing line of authority, which is described by the *Carrozzella & Richardson* court as follows:

[The second line of authority] focuses on the discrete transaction between the debtor and the defendant, without regard to the nature of the debtor's overall enterprise. The[se] cases have cited the narrow language of the Uniform Fraudulent Transfer Act that refers to the transfer at issue [*see, e.g.,* Ohio Rev. Code Ann. § 1336.05, which provides that a transfer is avoidable if the debtor made the transfer "without receiving reasonably equivalent value in exchange for the transfer"]. The[se] courts have measured what was given against what was received *in that transaction* . . . . [and have] described the "fatal legal flaw" in the reasoning adopted by the . . . [first] line of cases . . . as follows:

[I]t focuses not on a comparison of the values of the mutual consideration actually exchanged in the transaction between the [transferee] and the [d]ebtor, but on the value, or more accurately stated, the supposed significance or consequence of the [transferee-debtor] transaction in the context of the [d]ebtor's whole Ponzi scheme. . . . [T]he statutes and case law do not call for the court to assess the impact of an alleged fraudulent

transfer in a debtor's overall business. The statutes require an evaluation of the specific consideration exchanged by the debtor and the transferee in the specific transaction which the trustee seeks to avoid, and if the transfer is equivalent in value, it is not subject to avoidance under the law. [*In re Churchill Mortgage Inv. Corp,*] 256 B.R. [664,] 680 [ (Bankr.S.D.N.Y. 2000) ]. Simply because a debtor conducts its business fraudulently does not make every single payment by the debtor subject to avoidance.

[In the decisions comprising the second line of authority] [t]he courts have ... looked to the plain language of the Bankruptcy Code and the state-law fraudulent transfer acts that define "value" as including "satisfaction ... of an antecedent debt." 11 U.S.C. § 548(d)(2)(A);[Ohio Rev.Code Ann. § 1336.03(A) ]. [They hold] that the payment of interest to innocent investors pursuant to a contractual obligation clearly constitute[s] the satisfaction of an antecedent debt and, therefore, based upon the clear language of the statute, should be considered as the receipt of value by the debtor[,] ... reason[ing] that the debtor's use of the investor's funds for a period of time supported the payment of reasonable contractual interest and, [these courts further note that] if Congress did not intend such a result when the debtor was involved in a Ponzi scheme, it should so specify in the Bankruptcy Code rather than leaving it to the courts to ignore what is clearly value and fair consideration under the fraudulent conveyance statutes. To hold otherwise, the[se] [c]ourt[s] [reason], would ignore the universally accepted fundamental commercial principal that, when you loan an entity money for a period of time in good faith, you have given value

and you are entitled to a reasonable return.

. . . .

The[se] [c]ourt[s] also question[ ] why innocent investors should be treated any differently than a Ponzi-scheme operator's trade creditors, such as utility companies and landlords, since the payment of contractual debts owing to these trade creditors diminishes the debtor's estate in the same manner that payment of reasonable contractual interest to innocent investors diminishes the estate....

. . . .

[Cases adhering to this view] note[ ] that the[ ] decisions [comprising the first line of authority] have failed to explain why [an] illegal and unenforceable contract allows the repayment of principal but not interest.... [These courts point out] that allowing an investor to retain reasonable contractual interest does not further a Ponzi scheme any more than allowing that investor to retain repaid principal.

*Carrozzella & Richardson,* 286 B.R. at 488–90 (citations and internal quotation marks omitted). *See also Orlick v. Kozyak (In re Fin. Federated Title & Trust, Inc.),* 309 F.3d 1325, 1331–32 (11th Cir. 2002); *Solow v. Reinhardt (In re First Commercial Mgmt. Group, Inc.),* 279 B.R. 230, 235–39 (Bankr.N.D.Ill.2002); *World Vision Entm't,* 275 B.R. at 657–59; *Lustig v. Weisz & Assocs., Inc. (In re Unified Commercial Capital),* 2002 WL 32500567, at * *3–6 (W.D.N.Y. June 21, 2002), *aff'g Lustig v. Weisz & Assocs., Inc. (In re Unified Commercial Capital),* 260 B.R. 343, 349–54 (Bankr.W.D.N.Y.2001); *Balaber–Strauss v. Sixty–Five Brokers (In re Churchill Mortgage Inv. Corp.),* 256 B.R. 664 (Bankr.S.D.N.Y.2000), aff'd *sub nom. Balaber–Strauss v. Lawrence,* 264 B.R. 303 (S.D.N.Y.2001).

After discussing the split in the case law and explaining the legal reasoning underpinning each of the competing views, the *Carrozzella & Richardson* court concluded that the second line of authority provided the more sound approach for determining reasonable equivalency in the context of a Ponzi scheme case. The court stated:

> After a careful analysis of the divergent authority on this issue, we concur with the holding of the Bankruptcy Court that the proper focus of a fraudulent transfer inquiry is on the transfer itself, not the overall business practices of the Debtor. This is consistent with the language of the Uniform Fraudulent Transfer Act, which speaks in terms of the specific transaction. In this case, the Debtor paid the Defendants the agreed upon interest for use of the Defendants' money over time. The interest rates were reasonable, and there is no suggestion in the record that Defendants were anything but innocent investors. There is nothing to suggest that they were aware that the Debtor was operating a Ponzi scheme. This was not the typical "too-good-to-be-true" investment scheme. In exchange for the interest paid to the Defendants, the Debtor received a dollar-for-dollar forgiveness of a contractual debt. This satisfaction of an antecedent debt is "value," [within the meaning of the Connecticut fraudulent transfer statute], and in this case "reasonably equivalent value." To the extent that these Defendants had not been paid the interest owed, they would have been creditors of the Debtor's bankruptcy estate, asserting claims for unpaid interest.

As the Bankruptcy Court noted, there is nothing in the plain language of either the Bankruptcy Code or Connecticut's Uniform Fraudulent Transfer Act suggesting an illegality exception to the "reasonably equivalent value" requirement. As other courts have noted, if the illegality of the debtor's enterprise taints transfers of interest payments by the debtor, why does it not render *all* transfers voidable?

. . . .

> To create what is perceived by some to be an "equitable" exception to the plain language of the statute is to usurp the function of the legislature. There is nothing in the statute to support a finding that the Debtor did not receive "reasonably equivalent value" by virtue of the satisfaction of the debt owing to the investors, in return for its payment of contractual interest to Defendants, simply because the Debtor was engaged in a Ponzi scheme. Regardless of the Debtor's business, legitimate or otherwise, so long as the Debtor received "reasonably equivalent value" in exchange for its transfer of property, there has been no diminution in the Debtor's estate and the remaining creditors have not been damaged by the transfer. Had the insolvent Debtor simply given away money without an extinguishment of an underlying debt, the situation would be different. But, here, there was an extinguishment of a debt, such that those investors/creditors no longer have a claim against the Debtor's estate, which could diminish any recovery by the remaining creditors. As recognized by the Uniform Fraudulent Transfer Act and the Bankruptcy Code, satisfaction of an antecedent debt is value.

*Carrozzella & Richardson*, 286 B.R. at 490–92 (citations omitted).[18]

---

**18.** The *Carrozzella & Richardson* court also suggested that the decisions holding that transfers to investors in a Ponzi scheme are not, as a matter of law, supported by reasonably equivalent value given the illegality of the debtor's overall enterprise "have attempted to

■ Here, the Court need not choose between the two competing strands of authority. As explained below, application of either analytical framework leads to the same conclusion: Canyon simply did not receive reasonably equivalent value in exchange for the transfers of Comp Gold and cash received by the Defendants. Under *Taubman, National Liquidators* and the other decisions comprising the first line of authority, the Court may reach this conclusion as a matter of law. And under the competing line of authority—described and followed by the court in *Carrozzella & Richardson*—the same result is obtained, but as a matter of fact rather than law.

In *Taubman, National Liquidators* and the other decisions in the first line of authority, the courts hold that a debtor/Ponzi scheme operator fails to receive fair equivalent value in exchange for payments it makes in excess of the transferees' initial cash investment, because " 'all the debtor receives in return for a transfer is the use of the defendant's money to run a[n] [illegal] Ponzi scheme....' " *Taubman,* 160 B.R. at 986 (quoting *Indep. Clearing House,* 77 B.R. at 859). *See also Nat'l Liquidators,* 232 B.R. at 919 ("The Trustee has established that the Debtor received less than a reasonably equivalent value, because all that the Debtor received in return for the transfers was the use of the Defendants' money to run the '[P]onzi' scheme."). And, by assisting the debtor to continue the scheme, the transfers only worsen the harm suffered by creditors "by increasing the amount of claims while diminishing the debtor's estate." *Taubman,* 160 B.R. at 986 (internal quotation marks omitted). Thus, *as a matter of law,* "the

use of the defendant's money cannot objectively be called 'reasonably equivalent value.' " *Id.* Accordingly, under the first line of authority, the Court must conclude *as a matter of law* that Canyon failed to receive fair equivalent value in exchange for its transfers of Comp Gold and cash to the Defendants.

The decisions comprising the second line of authority described above by the *Carrozzella & Richardson* court stem from one of two distinct fact patterns—both of which are markedly different from the present case. The first fact pattern involves cases in which the trustee sought to recover transfers of cash by the debtor/Ponzi scheme operator to investors who were offered a facially reasonable contractual interest rate on a loan made to the debtor. In these cases, the courts held that the trustee could recover neither the principal amount repaid to the transferee nor the reasonable market rate of interest paid on the loan. *See Carrozzella & Richardson,* 286 B.R. at 484, 491 & n. 7 (recovery denied where: (1) the debtor obtained financing for its Ponzi scheme by offering 8% to 15% return on monies loaned at time when the prime rate was in excess of 15%, (2) court made a finding that the interest rates promised by the debtor were not unreasonably high, and (3) there was no suggestion in the record that Defendants were anything other than innocent investors); *Unified Commercial Capital,* 260 B.R. at 353 (recovery denied where court found that payment of 12% return on debentures and certificates of deposit marketed by debtor/Ponzi scheme operator

provide a 'just' solution to the losses suffered by innocent investors in a Ponzi scheme by reallocating and redistributing the losses sustained." *Carrozzella & Richardson,* 286 B.R. at 489. The court added: "In effect, ... these decisions have allowed the trustee to

utilize the fraudulent conveyance statutes as 'super preference' statutes to effect a reallocation of the debtor's assets, a matter that should be left to Congress." *Id.* (footnote omitted).

was "in 1997 ... [not] an unreasonable rate of contractual interest").

The *Carrozzella & Richardson* court and the district court in *Unified Commercial Capital* carefully limited their holdings to the specific facts of those cases. Distinguishing its fact pattern from that of the typical Ponzi scheme case, the *Carrozzella & Richardson* court stated:

> In this case, the Debtor paid the Defendants the agreed upon interest for use of the Defendants' money over time. *The interest rates were reasonable, and there is no suggestion in the record that Defendants were anything but innocent investors.* There is nothing to suggest that they were aware that the Debtor was operating a Ponzi scheme. *This was not the typical "too-good-to-be-true" investment scheme.* In exchange for the interest paid to the Defendants, the Debtor received a dollar-for-dollar forgiveness of a contractual debt. This satisfaction of an antecedent debt is "value[ ]" [under the Connecticut UFTA] [,] and in this case "reasonably equivalent value."

286 B.R. at 491 (emphasis added). Notably, *Carrozzella & Richardson* differed from the typical Ponzi scheme case because the debtor's principals initially were engaged in the practice of law but later ceased practicing and began soliciting investment "in a criminal enterprise possessing many of the attributes of a Ponzi scheme." *Id.* at 483. Further, "no proof [had been offered by the Chapter 7 trustee to establish] that the monies ... received [by the defendants]" came from the " 'pot' of common funds" received from investors in the Ponzi scheme "as opposed to law firm revenues." *Id.* at 491. The district court in *Unified Commercial Capital* also contrasted its fact pattern with that of a typical Ponzi scheme case involving the "payment[ ] of false profits, which the Pon-

zi schemer had simply fabricated in order to make it appear that his investments of the victims' money were yielding positive returns." 2002 WL 32500567, at *8. The district court explained:

> In the context of false profits, there may be some logic to such a distinction between transfers of principal and of amounts in excess of principal. If a person invests money with the understanding that he will share in the profits produced by his investment, and it turns out that there are no profits, it is difficult to see how that person can make a claim to receive any more than the return of his principal investment. The false representation by the Ponzi schemer that he is paying the investor his share of the profits, which are in fact nothing more than funds invested by other victims, cannot alter the fact that there are no profits to share.
>
> In the case at bar, however, [the debtor] represented that it was selling "debentures" and "certificates of deposit" to investors with "guaranteed" returns of twelve percent or more annually. Thus, the payments to [the defendant] were not simply payments of nonexistent profits, but of a contractually provided-for, commercially reasonable rate of interest on what amounted to a loan by [the defendant] to [the debtor]. As stated by [Bankruptcy] Judge Ninfo, that is ultimately no different from any other interest payments made by other types of debtors who were already hopelessly insolvent or unprofitable at the time that they borrowed money.

*Id.* (quoting *Indep. Clearing House*, 77 B.R. at 858).

As explained above, the second line of authority described by the *Carrozzella & Richardson* court—those cases that measure reasonable equivalency by focusing on each individual transfer challenged by the

trustee in a Ponzi scheme case, rather than the entirety of the illegal scheme— emanate from one of two common fact patterns. The first—just described—involves the debtor/Ponzi schemer who obtains loans from investors based on its promise to pay a reasonable market rate of interest on the funds invested. The second fact pattern involves the debtor/Ponzi schemer's payment of reasonable and customary fees or commissions to innocent, third-party brokers who were unaware of the existence of the Ponzi scheme at the time they solicited investors. *See First Commercial Mgmt.,* 279 B.R. at 230 (recovery disallowed based on finding that commissions paid by the debtor to innocent broker were "in line with commissions paid to other individuals performing similar services in the ... industry"); *World Vision Entm't,* 275 B.R. at 657 (concluding that recovery of reasonable commissions paid to innocent brokers by debtor/Ponzi scheme operator should not be ordered "simply because the commissions were paid by an entity engaged in a Ponzi scheme"); *Churchill Mortgage,* 256 B.R. at 674 (denying recovery where trustee did not "assert or intend to prove at a trial that the commissions paid to the [b]rokers did not constitute fair or reasonably equivalent value for the [b]rokers' services in the sense that the commissions were disproportionate to the commissions that would normally be paid for such services in the marketplace").

The undisputed facts of this case bear no resemblance to either of the two fact patterns described in the decisions comprising the second line of authority. Unlike the defendants in *Carrozzella & Richardson* and *Unified Commercial Capital,* who essentially made loans to the debtor/Ponzi schemer and were promised a reasonable, market rate of interest on those loans, the Defendants here were induced to invest with Canyon based on the prospect of an implausibly high return on their investment. All distributions of Comp Gold were made to the Defendants on the basis of at least a 35% return on their original investment. And the Defendants were offered much higher returns if they opted to exercise the roll-over option and purchase more Comp Gold. In short, this was the textbook "too-good-to-be-true investment scheme" described by the *Carrozzella & Richardson* court. 286 B.R. at 491. Thus, rather than representing "payment[ ] of ... a contractually provided-for, commercially reasonable rate of interest on what amounted to a loan by [the Defendants] to [Canyon][,]" the transfers of Comp Gold were "simply payments of nonexistent profits[.]" *Unified Commercial Capital,* 2002 WL 32500567, at *8. As the *Unified Commercial Capital* court so aptly put it,

> [i]f a person invests money with the understanding that he will share in the profits produced by his investment, and it turns out that there are no profits, it is difficult to see how that person can make a claim to receive any more than the return of his principal investment. The false representation by the Ponzi schemer that he is paying the investor his share of the profits, which are in fact nothing more than funds invested by other victims, cannot alter the fact that there are no profits to share.

*Id.* Thus, as the *Unified Commercial Capital* court pointed out, the distribution of false profits does not constitute the satisfaction of an antecedent debt within the meaning of the Code (see 11 U.S.C. § 548(d)(2)(A)) or the UFTA (*see* Ohio Rev.Code Ann. § 1336.03(A)). *Id.*

Application of the decisional framework described in the cases making up the second line of authority, which focuses on the discrete transfers between debtor and transferee rather than the totality of the

Ponzi scheme, does not alter the Court's conclusion that the Debtor received nothing of value in exchange for its transfers of false profits to the Defendants. Here, all distributions of Comp Gold were made on the basis of a return of *no less than* 35% over and above the amount each investor originally paid to Canyon. As detailed above, an investor who agreed to purchase $1,000 in gold coins from Canyon received coins valued at $700 and the Debtor's promise to pay $700 of Comp Gold in the future. After a deduction of $50 in "processing fees," the purchaser of $1,000 in gold coins actually would receive a net return of $650. Of this $650 in Comp Gold distributed by Canyon, the first $300 would make the investor whole and the balance of $350 represented the investor's 35% return. Again, for many investors who exercised the roll-over option, the return was much higher than 35%. For each distribution of $350 or more in false profits, Canyon failed to receive anything of value, much less reasonably equivalent value. In sum, based on the summary judgment record before it, the Court concludes that the Debtor failed to receive reasonably equivalent value in exchange for the transfers of Comp Gold to the Defendants.

Nor did Canyon receive reasonably equivalent value in exchange for its payment of commissions and overrides to the Defendants. In the hypothetical $1,000 transaction outlined above, Canyon also would be required to pay a $100 commission to the IA who procured the sale and owed overrides of between $10 and $100, depending on the depth of the down-line, to other IAs. Thus, in return for Canyon's payment of commissions and overrides to IAs—who solicited gold buyers for sale transactions in which Canyon was losing a minimum of 35% on each deal—the Debtor received nothing of value. Notably, Canyon did not solicit gold purchasers through independent brokers. Rather, the Defendants who received commissions and over-

rides were familiar with Canyon's scheme. All were IAs and therefore had completed sales training that included viewing the Training Video and passing an examination (*see* III. Factual Background, *supra* at 13). Indeed, some of the Defendants actually appeared in and participated in the production of the Training Video. And several of the Defendants were either relatives of Canyon's founder, Jack Johnson, or served on the company's board of directors. In contrast to the fact patterns in the "innocent broker" cases discussed above, the commissions and overrides here were not paid to independent third parties who, in return for a reasonable and customary fee, solicited investors for what appeared to be a facially reasonable investment transaction. *See, e.g., First Commercial Mgmt.*, 279 B.R. at 233 (third-party broker paid commissions "in line with commissions paid to other individuals performing similar services in the pay telephone industry"); *World Vision Entm't*, 275 B.R. at 657 (independent brokers selling promissory notes received "their normal fee for their usual services" and trustee conceded that commissions earned were reasonable); *Churchill Mortgage*, 256 B.R. at 674 (third-party mortgage and investment brokers were paid commissions proportionate to "commissions that would normally be paid for such services in the marketplace"). Rather, the Defendants who received overrides and commissions were either insiders, related to insiders, or were IAs at or near the top of the chains through which Canyon marketed its gold coins. The Court accordingly concludes that Canyon failed to receive reasonably equivalent value in exchange for its payment of commissions and overrides to the Defendants.

### c. Financial Condition

#### 1. Insolvency

The constructive fraud provisions of both the Code and the UFTA

provide that transfers made for less than reasonably equivalent value may be avoided if the debtor was insolvent when the transfers were made or became insolvent as a result of the transfers. *See* 11 U.S.C. § 548(a)(1)(B)(ii)(I); Ohio Rev.Code Ann. § 1336.05(A). The Bankruptcy Code defines "insolvent" with reference to an entity other than an individual, partnership or municipality as "a financial condition such that the sum of such entity's debts is greater than all of such entity's property, at a fair valuation, exclusive of property transferred, concealed, or removed with intent to hinder, delay, or defraud such entity's creditors." 11 U.S.C. § 101(32)(A)(i). Under the Ohio UFTA, "[a] debtor is insolvent if the sum of the debts of the debtor is greater than all of the assets of the debtor at a fair valuation. [ ] A debtor who generally is not paying his debts as they become due is presumed to be insolvent." Ohio Rev.Code Ann. § 1336.02(A)(1) and (2). Insolvency is essentially a balance-sheet test. *Foreman Indus., Inc. v. Broadway Sand & Gravel (In Matter of Foreman Indus., Inc.)*, 59 B.R. 145, 149 (Bankr.S.D.Ohio 1986). The Trustee bears the burden of proving by a preponderance of the evidence that, at the time the transfers were made to Defendants, or immediately following the transfers, the sum of Canyon's debts was greater than its property, at fair valuation, excluding any property transferred, concealed or removed with the intent to hinder, delay or defraud creditors. *Taubman*, 160 B.R. at 980.

The Trustee maintains that Canyon was insolvent from its inception based on the liabilities incurred with each transaction undertaken in the course of the Ponzi scheme, and that it remained insolvent throughout its 13–month existence. For their part, the Defendants argue that Canyon was not in fact insolvent, and the Trustee is therefore not entitled to recover profits from investors under either the Code or the Ohio UFTA. According to the Defendants, the Trustee has failed to take into account two significant facts: first, that Canyon did not actually *promise* payment of Comp Gold to any investor, but merely expressed its intention to make each one whole (i.e., to eventually pay the 30% difference between the initial amount paid in and the amount of gold received), if possible, based on sales volume; and second, that the Trustee did not consider potential profits that may have been generated from other lines of business had the gold coin operation not failed when it did.

As discussed above, Defendants' contention that Canyon did not actually promise to do more than make investors whole— i.e., return more than their initial investment—is belied by the content of its marketing materials and common sense. Yet even if Canyon had not made a legally enforceable promise to pay Comp Gold in an amount exceeding participants' initial investment, it would not change the Court's solvency calculus because—as the Trustee correctly points out—each transaction required the payment of commissions and overrides. Therefore, it did not matter whether Canyon eventually paid participants only the 30% necessary to make them whole, or the 30% plus a 35% profit. Under either scenario, Canyon was incurring liabilities in excess of its profits on each transaction. Further, while the Trustee does not dispute that a jewelry sales business was in a fledgling state when the company collapsed, he asserts that due to the structure of the gold coin sales programs, no companion enterprise, even if fully operational, could ever have generated sufficient profits to offset the losses from those programs. But whether Canyon may have become a profitable enterprise at some hypothetical date in the future is beside the point. For purposes

of applying the constructive fraud provisions of the Code and the Ohio UFTA, the Court must determine whether a debtor's liabilities exceeded its assets at the time of the alleged fraudulent transfers, *see* 11 U.S.C. § 548(a)(1)(B)(ii)(I), and Ohio Rev. Code Ann. § 1336.05(A), not whether its possible liabilities might exceed its potential assets at some unspecified future date.

In the report Zavakos prepared on behalf of the Defendants ("Zavakos Report"), she focused on whether Canyon's jewelry program, had it been implemented at the same time as the gold coin programs, would have generated sufficient sales to offset the losses generated from the sale of gold coins. Her conclusion was that "the combined net income of all jewelry sales would have equaled $1,044,337 for the period of May 1996 to April 1997. That total partially offsets the loss projected for the gold program, using the 'make whole' assumption." (Zavakos Report at 2.) But the jewelry sales program did not in fact commence until near the end of Canyon's existence, and the assumptions upon which Zavakos supports her jewelry sales projections are based in part on the reported successes of various internet merchants during 1996 and 1997. Zavakos opined that had Canyon sold jewelry over the internet, its online sales may have grown at a rate of 8% each month. (Zavakos Dep. 36–42.) The Court notes, however, that Canyon never established a website and thus made no internet sales. (Zavakos Dep. 37–38.)

Zavakos's deposition testimony supports the Trustee's assertion that the gold coin programs were never profitable and would never have become profitable. Following a discussion of whether Canyon had any capital with which it could have purchased jewelry inventory, Zavakos admitted that Canyon was not generating any profit. (Zavakos Dep. 58–59.) The Trustee then posed the following questions regarding Canyon's solvency:

RIESER: I'm asking, as you sit here today or with what you've done so far, can you identify any point in time when Canyon Systems as it operated was, in fact, profitable?

ASH: Objection. Go ahead.

ZAVAKOS: Without having started out their jewelry sales when they should have and their other segments, no, I cannot see where they would have generated a profit.

RIESER: In fact, based on their financial statements that you did review, you never could identify, in fact, getting zero hypothetical jewelry sales for a moment, when they were, in fact, profitable?

ZAVAKOS: No, I cannot identify where they would have been profitable, no.

RIESER: So they were insolvent from the get-go?

RIESER: On a balance sheet basis, yes?

ZAVAKOS: Well, it's hard to say. They did, in fact, have jewelry sales. They just started late. I can't say during that whole entire period they wouldn't have been profitable.

RIESER: I want you to ignore your hypothetical jewelry sales for a moment—

ZAVAKOS: Okay.

RIESER: —and answer my question. Based on what you actually reviewed, were they insolvent from the get-go, that is, from day one?

ZAVAKOS: Yes.

RIESER: And they remained insolvent from conception to the date of their bankruptcy filing, based on what you reviewed?

ZAVAKOS: Yes.

. . . .

RIESER: You told me a few minutes ago that you agree with the concept that, in fact, absent these hypothetical jewelry sales, based on everything you were provided with, Canyon was insolvent from the beginning up until the date of its bankruptcy.

ZAVAKOS: That's true.

(Zavakos Dep. 59–61, 67.)

The Trustee's expert came to the same conclusion:

5. It is my professional opinion that Debtor's gold coin programs were structured in a manner that guaranteed the insolvency of the enterprise and its ultimate failure. From an accounting standpoint, generally accepted accounting principles required that the transactions associated with the gold coin programs be recorded in a manner that would result in realization of a loss on every transaction, with each additional transaction adding to that loss.

6. Canyon's financial statements demonstrate that it commenced operations with absolutely no capital. Given this fact and the fact that the activities were structured in a manner that insured enterprise losses, it follows that Debtor was insolvent from a balance sheet standpoint (recorded liabilities exceeded recorded assets) from the inception of its operations and grew increasingly so throughout its operation. Canyon's

gold coin programs did not generate profits to pay "Comp Gold" and Comp Gold, Commissions and Overrides could only be funded from future sales in Canyon's gold coin programs. . . .

Kramer Aff. ¶¶ 5–6.

Based on Zavakos's deposition testimony and the affidavits of both experts, no genuine issue of material fact exists as to Canyon's insolvency at the time the challenged transfers were made. The Court finds that Canyon was insolvent from its inception and that the Trustee has met his burden of establishing insolvency, both under the Bankruptcy Code and the Ohio UFTA. The transfers in question were made between May 1996 and June 1997. The gold coin sales programs were essentially the only enterprise in which the Debtor was engaged during that time period. These programs, as they were structured, guaranteed ongoing and increasing losses. In short, no credible evidence was submitted by the Defendants to establish that Canyon was anything other than hopelessly insolvent from the commencement of its operations through the Petition Date. *See Carrozzella & Richardson,* 286 B.R. at 486 n. 17 ("[A] Ponzi scheme is insolvent from its inception and becomes increasingly insolvent as the scheme progresses."); *First Commercial Mgmt. Group,* 279 B.R. at 235 ("The issue of insolvency is not in dispute here, because by definition a Ponzi scheme inevitably becomes insolvent at some point."); *Lake States II,* 272 B.R. at 242 ("The cases generally concur that if a Ponzi scheme is proven, then the debtor is presumed insolvent from the time of its inception."); *Taubman,* 160 B.R. at 978 ("The promised rates of return, because they are in excess of any real investments, render a [P]onzi scheme operator insolvent form the inception of the scheme.").

### 2. Unreasonably Small Capital

■ "The phrase 'unreasonably small capital' is not defined in the Bankruptcy Code [or the UFTA]. Its meaning must, therefore, be ascertained upon a case-by-case review of the capital structure of a debtor's business." *Yoder v. T.E.L. Leasing, Inc. (In re Suburban Motor Freight, Inc.),* 124 B.R. 984, 998 (Bankr.S.D.Ohio 1990) (citations omitted). *See also Taubman,* 160 B.R. at 986 (same). The Court's finding that Canyon was engaged in a Ponzi scheme—and thus was insolvent from the inception of its business—likewise compels the conclusion that the Debtor was operating with unreasonably small capital at the time the transfers in question were made. *See Emerson v. Maples (In re Mark Benskin & Co.),* 161 B.R. 644, 650 (Bankr.W.D.Tenn.1993) ("[T]he fact that the debtor operated primarily if not exclusively on fraudulently obtained funds establishes that the debtor had little if any legitimate operating capital. It would seem axiomatic that the debtor was operating its business with unreasonably small capital."), *aff'd,* 1995 WL 381741, 1995 U.S.App. LEXIS 16053 (6th Cir. June 26, 1995); *Taubman,* 160 B.R. at 986 ("The court determines in the circumstances of this [Ponzi scheme] case, that insolvency constitutes unreasonably small capital *per se.*").

### 3. Intent to Incur Debts Beyond Ability to Repay

■ In *Taubman,* the court held:

As a result of the Debtor's continuous insolvency and operation of a[P]onzi scheme, the court finds that the Debtor intended to incur, or believed that she would incur, debts beyond her ability to pay such debts as they mature. Although this prong involves a determination of the Debtor's subjective intent,

this finding is completely supported by the uncontradicted evidence.

160 B.R. at 987. Just so here. Although determinations of subjective intent are generally not appropriate by way of summary judgment, given the undisputed evidence that Canyon was operating a Ponzi scheme from the time it commenced operations, the Court may find as a matter of law that the Debtor intended to incur debts beyond its ability to repay. *See C.F. Foods,* 280 B.R. at 116 ("[O]peration of the Debtor's Ponzi scheme shows his subjective intent to incur debts beyond the Debtor's ability to pay as they became due."); *Nat'l Liquidators,* 232 B.R. at 919 ("While the Debtor's intent to incur debts that were beyond its ability to pay is not known specifically, it can be inferred as a result of the debtor's continuous insolvency and operation of a [P]onzi scheme." (internal quotation marks omitted)).

### C. Availability of § 548(c)'s Good Faith Defense

The Trustee asserts that the "good faith" affirmative defense set forth in § 548(c) of the Code is unavailable to the Defendants. Section 548(c) provides that:

Except to the extent that a transfer or obligation voidable under this section is voidable under section 544, 545, or 547 of this title, a transferee or obligee of such a transfer or obligation that takes for value and in good faith has a lien on or may retain any interest transferred or may enforce any obligation incurred, as the case may be, to the extent that such transferee or obligee gave value to the debtor in exchange for such transfer or obligation.

11 U.S.C. § 548(c).

■ Under § 548(c), "the good faith giving of the value to the debtor in exchange for a transfer made by the debtor with actual intent to hinder, delay, or

defraud creditors is an affirmative defense as to which the burden of proof rests with the defendant." *Wilson v. Carman (In re Blazo Corp.)*, 1995 WL 764130, at *3 (6th Cir. Dec. 27, 1995). In order to establish a defense to avoidability, a transferee must show *both* that the transfer was for reasonably equivalent value and was received in good faith. *See* 11 U.S.C. § 548(c); *Durkin v. Shields (In re Imperial Corp. of America)*, 1997 WL 808636, at *4 (S.D.Cal. Aug. 14, 1997). To retain the cash and/or Comp Gold received from Canyon, each Defendant must establish both elements of § 548(c)'s good faith defense: (1) that he/she took the transfers contested by the Trustee for value and (2) the transfers were received in good faith. *See Blazo Corp.*, 1995 WL 764130, at *3; *Noland v. Hunter (In re Nat'l Liquidators, Inc.)*, 232 B.R. at 99, 102 (Bankr.S.D.Ohio 1999).[19]

 "The [two] terms—'reasonably equivalent value' in Section 548(a)(1)(B) [and Ohio Revised Code §§ 1336.04(A)(2) and 1336.05(A) ] . . . and 'value' in Section 548(c)—have the same fundamental meaning." *Churchill Mortgage*, 256 B.R. at 677. Having previously determined that the Defendants failed to provide Canyon with reasonably equivalent value in exchange for its transfers of false profits, commissions and overrides, the Court need not undertake a good faith analysis. Because Canyon did not receive value from the Defendants in exchange for the transfers challenged by the Trustee, they may not avail themselves of the good faith defense afforded by § 548(c) of the Code and Ohio Revised Code § 1336.08.

## D. Ohio Pyramid Sales Law

In the seventh claim for relief set forth in his Complaints, the Trustee alleges that Canyon's gold coin programs constituted an illegal pyramid sales plan or program within the meaning of the Ohio Pyramid Sales Act ("OPSA").[20] The Trustee seeks two forms of relief under the OPSA. First, pursuant to § 544(b) of the Code (set forth and discussed below) and Ohio Revised Code § 1333.93, the Trustee requests an order voiding the contracts between Canyon and each Defendant. *See* Complaint (Adv.Pro. No. 03–2605), ¶ 100. Second, the Trustee seeks to recover under Ohio Revised Code § 1333.93 "from [each] Defendant the amount the Defendant received from the scheme by receiving distributions [of Comp Gold]" as well as "the amount of consideration paid by all other participants in the Gold/Comp Gold Programs who did not receive Comp Gold, or who did not receive all of the Comp Gold needed to make them whole, together with attorney fees." Complaint (Adv.Pro. No. 03–2605), ¶ 100–101. Thus, the Trustee seeks not only to have the contracts between Canyon and the Defendants declared void, but also a money judgment against each Defendant ("OPSA Damage Claim") "in an amount equal to all out-of-pocket losses and damages suffered by all participants or purchasers in any of the Gold/Comp Gold Programs, . . . [which is] as yet undetermined but believed to be in excess of Five Million Dollars ($5,000,-000.00); and . . . additionally . . . damages

**19.** The Ohio UFTA offers a substantially similar good faith defense to the recipient of an actual or constructive fraudulent transfer. *See* Ohio Rev.Code Ann. § 1336.08. The Trustee did not seek summary judgment as to the availability of this defense to the Defendants. Nevertheless, the Court notes that its good faith analysis under § 548(c) is identical to that undertaken under Ohio Revised Code § 1336.08. *Compare Hunter,* 232 B.R. at 102 (construing § 548(c)) *with Aristocrat Lakewood Nursing Home v. Dryja (In re Dryja),* 259 B.R. 629, 634 (Bankr.N.D.Ohio 2001) (construing Ohio Revised Code § 1336.08).

**20.** *See* footnote 5, *supra.*

from [each] Defendant in an amount equal to [the total of all Comp Gold, commissions and overrides received by each Defendant], . . . together with reasonable attorney fees. . . ." *See* Complaint (Adv.Pro. No. 03–2605), at 22, ¶ I (emphasis and capitalization deleted).

The Defendants concede that Ohio Revised Code § 1333.93 provides a basis to void their contracts with Canyon. The Defendants, however, maintain that the Trustee is not entitled to the relief he seeks on his OPSA Damage Claim for two reasons. First, they point out that Ohio Revised Code § 1333.93 is inapplicable here because Canyon's gold coin programs did not constitute an illegal pyramid scheme as defined in Ohio Revised Code § 1333.91(A), and the Defendants did not in fact receive compensation either: (1) "for introducing [a] person [or persons] into participation in . . . [Canyon's] pyramid sales plan or program;" or (2) "when another participant has introduced the person into participation in . . . [Canyon's] pyramid sales plan or program." Second, the Defendants argue that § 544(b) of the Code does not grant the Trustee standing to bring the OPSA Damage Claim.[21] Thus, according to the Defendants, even if Ohio Revised Code § 1333.93 applies here—i.e., the Court finds that Canyon operated an illegal pyramid scheme and further determines that the Defendants did actually receive compensation for introducing new participants into the scheme—any damage claim created by the statute may not be brought by the Trustee. Because the OPSA creates a cause of action in favor of a pyramid scheme participant against those who received compen-

sation for introducing the participant to the scheme, Defendants argue that the claim the Trustee seeks to bring belongs to individual creditors and may not be asserted on behalf of Canyon's bankruptcy estate.

### 1. Applicability of Ohio Revised Code § 1333.93

■ Section 1333.93 of the Ohio Revised Code provides:

> Any contract made in violation of section 1333.92 of the Revised Code is void. Any person who has paid consideration for the chance or opportunity to participate in a pyramid sales plan or program may recover, in a civil action, the amount of the consideration paid, together with reasonable attorney fees, from any participant who has received compensation under either of the following circumstances:
>
> (A) For introducing the person into participation in a pyramid sales plan or program;
>
> (B) When another participant has introduced the person into participation in a pyramid sales plan or program.

Ohio Rev.Code Ann. § 1333.93. In passing on Defendants' contention that Ohio Revised Code § 1333.93 is simply not applicable here because they did not receive compensation for introducing other participants into a pyramid scheme within the meaning of the statute, the Court must first determine whether Canyon's gold coin programs fit the definition of a pyramid scheme under the OPSA. Section 1333.91 of the Ohio Revised Code states:

---

**21.** None of the Defendants responded to the Trustee's argument in the Motion that § 544(b)(1) affords him standing to assert claims under the OPSA, including damage claims. Nonetheless, at an earlier stage of this adversary proceeding the Defendants filed motions to dismiss the Trustee's OPSA claims on standing grounds. The Court deferred a ruling on this standing question pending resolution of the remaining issues raised in the Motion.

(A) A "Pyramid sales plan or program" means any scheme, whether or not for the disposal or distribution of property, whereby a person pays a consideration for the chance or opportunity to receive compensation, regardless of whether he also receives other rights or property, under either of following circumstances:

(1) For introducing one or more persons into participation in the plan or program;

(2) When another participant has introduced a person into participation in the plan program.

(B) "Compensation" means money, financial benefit, or anything of value. Compensation does not include payment based upon sales made to persons who are not participants in a pyramid sales plan or program, and who are not purchasing in order to participate in the plan or program.

Ohio Rev.Code Ann. § 1333.91. Ohio Revised Code § 1333.92 provides that "[n]o person shall propose, plan, prepare or operate a pyramid sales plan or program." Ohio Rev.Code Ann. § 1333.92.

Under Canyon's gold coin sales programs, only IAs could sell coins. Each IA received compensation—in the form of commissions and overrides—for every sale of coins to a new person that the IA introduced into the program. IAs also received commissions and overrides on each sale generated by every participant in that IA's down-line (down to 10 levels below the IA). This scheme fits within Ohio's statutory definition of a pyramid sales plan or program. *See, e.g., State v. Guinn*, 42 Ohio St.3d 92, 537 N.E.2d 656, 657–58 (1989) (program consisted of "airplane" scheme that had the following features: (1) the positions in the program, were, from top down, "pilot," "co-pilots," "crew," and "passengers;" (2) each new passenger paid $1,500 to the pilot; (3) when all eight positions at the bottom of the pyramid were filled with passengers, the pilot would leave the plan; (4) after the pilot left the plan, the pyramid would break in half, each participant would move up one position, and the splitting would continue until each investor reached the top of his own pyramid.); *In re Disposition of Prop. Held by Geauga County Sheriff*, 129 Ohio App.3d 676, 718 N.E.2d 990, 991 (1998) (nearly identical program); *State ex. rel. Celebrezze v. Howard*, 77 Ohio App.3d 387, 602 N.E.2d 665, 667–69 (1991) (nearly identical program); *State ex rel. Celebrezze v. First Fin. Sec., Inc.*, Case No. 87–CV–12–8048 (Franklin County Ct. of Common Pleas Nov. 27, 1992) (participants paid $75 for the chance to receive commissions for introducing others into plan). The programs in the foregoing cases were held to violate the Ohio Pyramid Law because they compensated participants—who moved up the pyramid and eventually cashed out—for merely introducing others into participation in the program.

According to the Defendants, Canyon's gold coin sales programs do not meet the statutory definition of a pyramid scheme contained in Ohio Revised Code § 1333.91(A), and they did not engage in the activity proscribed by the statute, because they (and other participants in these programs) were not paid compensation merely for introducing new participants to the scheme. Rather, they argue, IAs were paid only for completing sales of gold coins, or in the event that other IAs in their down-line did so. This argument is unpersuasive. Granted, IAs did not receive compensation *solely* for introducing new participants to Canyon's gold coin sales programs. Commissions and overrides became payable to an IA when new participants that he/she recruited bought

gold (or new recruits in the IA's down-line did so). Yet, it is undisputed that IAs were compensated not only on the basis of their own sales, but for sales generated by those they brought into the program. Thus, those Defendants who received commissions and overrides did in fact receive "compensation" for "introducing one or more persons into participation" in the Debtor's program, within the meaning of the OPSA. Further, the Defendants do not contend that the compensation they received from Canyon was based upon sales made to persons who were not participants in the gold coin programs, which would take the transaction outside of the scope of the statute. *See* Ohio Rev.Code Ann. § 1333.91(B). Presumably, the participants in each IA's downline made purchases in order to participate in the plan or program because, as discussed above, unless one were participating in the program in anticipation of receiving Comp Gold, there was no reason to purchase gold from Canyon and receive gold valued at only 70% of the purchase price.

## 2. The Trustee's Standing to Assert the OPSA Damage Claim

 Having determined that Canyon's gold coin programs were in fact a pyramid scheme as defined in the OPSA, and that Ohio Revised Code § 1333.93 is applicable here because the Defendants received compensation for introducing others into the scheme, the Court turns to the question of whether the Trustee has standing to bring the OPSA Damage Claim.

According to the Trustee, his standing to bring the OPSA Damage Claim is granted by § 544(b) of the Code, which states:

[T]he trustee may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under section 502 of this title or that is not allowable only under section 502(e) of this title.

11 U.S.C. § 544(b). As discussed above, Ohio Revised Code § 1333.93 provides two distinct remedies. First, the statute voids any contract between a pyramid scheme operator and a participant in the scheme. Second, § 1333.93 provides a claim for money damages by allowing an injured participant in a pyramid scheme to recover the amount the participant paid in, as well as attorney fees, from any other participant who received compensation for introducing the injured participant into the scheme.[22] The Trustee asserts—and Defendants do not dispute—that Canyon's contractual obligation to pay commissions and overrides to the Defendants may be voided under § 544(b) of the Code and Ohio Revised Code § 1333.93. The Defendants contend, however, that § 544(b) does not provide the Trustee with standing to assert damage claims on behalf of individual Canyon investors who paid into the scheme and either did not receive Comp Gold, or did not receive enough Comp Gold to make them whole. By attempting to do so, they argue, the Trustee seeks to usurp the right granted by Ohio Revised Code § 1333.93 to each individual pyramid scheme participant to recover the amount that he/she paid into the scheme from

---

**22.** The civil damages provision of the Ohio Pyramid Sales Law is hardly a model of statutory clarity. With the exception of the originator of a pyramid scheme, all participants are at one time a new recruit. Thus, it seems somewhat incongruous to permit one participant in a pyramid scheme to recover damages from other participants. Putting aside the issue of the circularity of this statutory remedy, the right of action created by Ohio Revised Code § 1333.93 would seemingly punish, rather than protect, many victims of the scheme.

those who were paid compensation for recruiting the participant. According to the Defendants, because the right of action created by the second sentence of Ohio Revised Code § 1333.93 is neither an avoidance claim (i.e., a claim to avoid and recover a transfer of the Debtor's property) nor a claim that may be brought by the Debtor (as the operator of the pyramid scheme), the Trustee lacks standing to assert the claim on behalf of Canyon's bankruptcy estate. The Court agrees. For the reasons explained below, the Court concludes that the Trustee does not have standing to assert the OPSA Damage Claim.[23]

Section 704 of the Bankruptcy Code provides that a Chapter 7 trustee "shall collect and reduce to money the *property of the estate* for which the trustee serves...." 11 U.S.C. § 704(1) (emphasis added). *See also Spartan Tube & Steel, Inc. v. Himmelspach (In re RCS Engineered Prods. Co.)*, 102 F.3d 223, 225 (6th Cir.1996). It is "well established that the 'interests of the debtor in property' include 'causes of action.'" *Honigman v.*

*Comerica Bank (In re Van Dresser Corp.)*, 128 F.3d 945, 947 (6th Cir.1997) (quoting *Bauer v. Commerce Union Bank (In re Bauer)*, 859 F.2d 438, 441 (6th Cir. 1988)). *See also Mixon v. Anderson (In re Ozark Rest. Equip. Co.)*, 816 F.2d 1222, 1225 (8th Cir.) ("[W]henever a cause of action 'belongs' to the debtor corporation, the trustee [or debtor-in-possession] has the authority to pursue it in bankruptcy proceedings."), *cert. denied*, 484 U.S. 848, 108 S.Ct. 147, 98 L.Ed.2d 102 (1987). To accomplish the goal of marshaling all available assets of the bankruptcy estate, the trustee is given statutory power to sue and be sued, *both* as an estate representative, *see* 11 U.S.C. § 323(b); *Bauer*, 859 F.2d at 441, and as a creditor of the estate, *see* 11 U.S.C. § 544. *See also Sender v. Simon*, 84 F.3d 1299, 1304 (10th Cir. 1996) ("Causes of action commenced by a trustee on behalf of a debtor estate fall into two broad categories: (1) actions brought by the trustee as successor to the debtor's interests included as property of the estate under 11 U.S.C. § 541, and (2)

**23.** In his seventh claim for relief, the Trustee seeks to recover damages under the OPSA from the Defendants in two alternative amounts: (1) the total of all transfers of cash and gold received by each individual Defendant over and above the amount of that Defendant's original investment—i.e., the total false profits paid to each Defendant; and (2) an "amount equal to all out-of-pocket losses and damages suffered by all participants or purchasers in any of the Gold/Comp Gold Programs, ... [which is] as yet undetermined but believed to be in excess of Five Million Dollars ($5,000,000.00)," plus attorney fees. Complaint (Adv.Pro. No. 03–2605), at 22, ¶ I. Insofar as the claim for recovery of false profits is concerned, the relief requested under the OPSA is identical to that which the Trustee seeks on his actual and constructive fraudulent transfer claims under the Code and the Ohio UFTA. The Trustee argues that he also may avoid the transfers of false profits to the Defendants under Ohio Revised Code § 1333.93, which provides that "[a]ny con-

tract made in violation of section 1333.92 of the Revised Code is void[,]" and that he may recover the avoided transfers pursuant to § 550(a) of the Bankruptcy Code. However, a careful reading of Ohio Revised Code § 1333.93 and § 550(a) of the Code reveals that the Trustee may not use these statutes as a basis for recovery of the false profits received by the Defendants. Ohio Revised Code § 1333.93 provides only that "contract[s]" made in violation of the OPSA are void; it does not authorize the avoidance of transfers of property. Section 550(a) of the Code, in turn, enables a trustee to "recover, for the benefit of the estate, ... property transferred or, if the court so orders, the value of such property" from the transferee. 11 U.S.C. § 550(a). Because Ohio Revised Code § 1333.93 calls for the avoidance of contractual obligations, but not for the avoidance of property transfers, avoidance and recovery of the false profits received by the Defendants is not a form of relief available to the Trustee under the OPSA and § 550(a) of the Code.

actions brought under one of the trustee's avoidance powers."); *Jones v. Hyatt Legal Servs. (In re Dow)*, 132 B.R. 853, 861 (Bankr.S.D.Ohio 1991) ("The bankruptcy trustee has a dual role; the trustee represents not only the rights of the debtor but also the interests of creditors of the debtor.").

Relying on § 544(b)(1), Rieser asserts that he has standing in his creditor capacity to bring both a claim for avoidance and for recovery of damages under the OPSA. Section 544(b)(1) of the Bankruptcy Code grants the Trustee the power to "avoid any transfer of an interest of the debtor in property ... that is voidable under applicable law...." 11 U.S.C. § 544(b)(1). As previously noted, the Trustee may rely on the first sentence of Ohio Revised Code § 1333.93—which renders void contracts made in connection with the operation of a pyramid scheme—to avoid Canyon's contractual obligations to the Defendants. But the Trustee's contention that § 544(b)(1) also empowers him to assert a damage claim against the Defendants under Ohio Revised Code § 1333.93 is flatly wrong. "It is only the power 'to *avoid*' transfers or obligations that the trustee receives through § 544(b)." *Kleven v. Stewart (In re Myers)*, 320 B.R. 667, 669 (Bankr.N.D.Ind.2005).

The bankruptcy court's decision in the *Myers* case is instructive because the trustee there—like Rieser here—attempted to use § 544(b)(1) as a basis for both the avoidance of prepetition transfers and the assertion of a state law claim for recovery of damages. The trustee's damage claim was based on an Indiana statute allowing victims of crimes to recover three times their actual damages and attorney fees from the perpetrator of the crime. Arguing that a recipient of the debtor's fraudulent transfers committed a crime by knowingly aiding the debtor in making transfers of cash with intent to defraud creditors, the trustee sought to recover the transferred funds plus treble damages and attorney fees. The *Myers* court rejected this argument and dismissed the claim for treble damages and attorney fees, reasoning:

> It is often said that § 544(b) allows the trustee to step into the shoes of a debtor's creditors and take advantage of state law concerning fraudulent conveyances. That is exactly what the trustee contends she is doing here: stepping into the shoes of an actual creditor of the debtor ... and asserting its rights under Indiana law as the result of the fraudulent conveyances to the defendant, rights which she believes include the opportunity to recover treble damages and attorney fees. Yet, regardless of whether the trustee's view of Indiana law is correct, her argument overlooks a significant structural limitation on the rights the trustee is given by § 544(b). That portion of the Bankruptcy Code does not give the trustee the power to pursue any action that might be brought by a debtor's creditors.... Thus, the trustee is limited to the avoidance claim.... *If the trustee seeks to do something other than avoid a particular transaction, the power to do so must come from somewhere other than § 544(b).*

*Myers*, 320 B.R. at 669 (emphasis added) (citations omitted). *See also Savage & Assocs., P.C. v. BLR Servs. SAS (In re Teligent, Inc.)*, 307 B.R. 744, 749 (Bankr. S.D.N.Y.2004) ("The plaintiff overlooks the plain language of § 544(b) when she urges that it sweeps in common law tort claims that belong to creditors under state law."); *Dow*, 132 B.R. at 862 ("Subsection (b) of 544 permits the trustee to avoid certain transfers of the debtor's interests voidable under state law. Section 544[ (b) ] does not give a trustee the right to pursue *all*

actions by creditors against third-party defendants who have some connection with the debtor.").

■ Because § 544(b)(1) provides only the power of avoidance, it does not confer authority on the Trustee to pursue state law damage claims. "[T]he power to do so must come from somewhere other than § 544(b)." *Myers*, 320 B.R. at 669. There are two other possible statutory sources of standing—neither of which were cited by Rieser in the Motion—to which the Trustee may turn for authority to bring his OPSA damage claims. First, as previously stated, in his capacity as the representative of the bankruptcy estate the Trustee succeeds to Canyon's property interests and may assert causes of action belonging to the Debtor. *See* 11 U.S.C. §§ 323, 541(a). *See also PM Denver v. Porter (In re Porter McLeod, Inc.)*, 231 B.R. 786, 792 (D.Colo.1999) ("When a trustee brings an action pursuant to § 541(a) as successor to debtor's interests in property, his standing stems from his debtor's status qua debtor."). Second, under § 544(a),[24] the Trustee occupies the status of a hypothetical lien creditor and in that creditor capacity "has standing to pursue not only claims of the debtor corporation but those obtained derivatively from creditors." *Porter McLeod*, 231 B.R. at 793. *See also Collins v. Kohlberg & Co. (In re S.W. Supermarkets, LLC)*, 325 B.R. 417, 425 (Bankr. D.Ariz.2005) ("[Section] 544(a)(2) was intended to permit the trustee to bring a creditors' bill to reach choses in action belonging to his debtor." (internal citations omitted)); *Wieboldt Stores, Inc. v. Schottenstein*, 131 B.R. 655, 668 (N.D.Ill.1991) ("[W]hen a trustee brings a claim such as breach of fiduciary duty, he or she brings the claim in the name of the corporation for the benefit of all persons entitled to participate in the recovery. Accordingly, the trustee is acting in his capacity *as a creditor* under Section 544(a) to bring a 'creditors' bill' to reach choses of action belonging to the debtor." (citation and internal quotation marks omitted)). In his creditor capacity under § 544(a), the Trustee may "assert only causes of action that the [D]ebtor corporation could have asserted." *Southwest Supermarkets*, 325 B.R. at 425. So whether the Trustee is acting in his capacity as estate representative *(see* 11 U.S.C. §§ 323(b), 541(a) and 704(1)), or in his creditor capacity under § 544(a), his standing to assert the OSPA Damage Claim turns on whether the claim belongs to Canyon or its individual creditors. As explained below, because the OPSA Damage Claim belongs to individual creditors of Canyon and could not be asserted by the Debtor corporation, the Trustee lacks standing—either in his capacity as the Debtor's successor-in-interest or as a creditor representative—to assert the claim.

The well-established rule that bankruptcy trustees lack standing to bring third-

---

**24.** Section 544(a) provides, in pertinent part, as follows:

(a) The trustee shall have, as of the commencement of the case, and without regard to any knowledge of the trustee or of any creditor, the rights and powers of, or may avoid any transfer of property of the debtor or any obligation incurred by the debtor that is voidable by—

(1) a creditor that extends credit to the debtor at the time of the commencement of the case, and that obtains, at such time and with respect to such credit, a judicial lien on all property on which a creditor on a simple contract could have obtained such a judicial lien, whether or not such a creditor exists;

a creditor that extends credit to the debtor at the time of the commencement of the case, and obtains, at such time and with respect to such credit, an execution against the debtor that is returned unsatisfied at such time, whether or not such a creditor exists[.]

11 U.S.C. § 544(a).

party claims belonging solely to the estate's creditors emerged from the Supreme Court's decision in *Caplin v. Marine Midland Grace Trust Co.*, 406 U.S. 416, 92 S.Ct. 1678, 32 L.Ed.2d 195 (1972). There, the bankruptcy trustee attempted to assert claims of misconduct by an indenture trustee on behalf of the holders of debentures issued by the bankrupt entity. The Supreme Court held that the trustee did not have standing to pursue these claims. *Id.* at 428–34, 92 S.Ct. 1678. The *Caplin* decision rested on three grounds: (1) the Bankruptcy Act then in effect contained no provision granting the trustee authority to collect money not owed to the estate; (2) the debtor corporation had no independent action of its own against the indenture trustee; and (3) an action by the trustee would not bind the third-party debenture holders, raising the prospect of conflicting results, proliferation of litigation and questions arising as to who would be bound by the outcome of the trustee's litigation. *Id.*

The limitation on trustee standing established by *Caplin* was carried forward into the Bankruptcy Code. "[T]he final version of section 544 enacted by Congress in the 1978 Act did not contain the proposed subsection (c) which would have statutorily overruled *Caplin*, thereby allowing the trustee to enforce claims of individual creditors or a class of creditors with similar claims against a third party." *Still v. Cong. Fin. Corp. (In re S.W. Equip. Rental, Inc.)*, 102 B.R. 132, 138 (E.D.Tenn. 1989). *See also Ozark Rest. Equip. Co.*, 816 F.2d at 1227 ("[Section 544 does not] authorize the trustee to bring suits on behalf of the estate's creditors against third parties. In fact, the legislative history suggests just the opposite.").

"Since *Caplin*, courts addressing trustee standing have answered the question in the same way, although they have formu-

lated the question in two [different] ways. [One line of cases] formulate[s] the question around whether, under the relevant state law, the asserted claim belongs to the debtor or its individual creditors." *Schnelling v. Thomas (In re AgriBioTech, Inc.)*, 319 B.R. 216, 220 (D.Nev.2004). *See, e.g., Himmelspach*, 102 F.3d at 225–27 (holding that bankruptcy trustee did not have standing to pursue alter ego claim against debtor's parent company because, under Michigan law, a subsidiary could not bring an alter ego action against its parent company); *Ozark Rest. Equip. Co.*, 816 F.2d at 1227–30 (holding that trustee could not pursue alter ego claim to pierce its own corporate veil where state law did not permit corporation to pierce its own veil and claim therefore belonged to the estate's creditors). A second line of authority looks to "whether the asserted claims [are] 'general' claims of harm inflicting [damages] on all creditors, or 'specific' claims where a creditor suffers individualized harm peculiar to that creditor." *AgriBioTech*, 319 B.R. at 220–21. Decisions applying this general-versus-individualized-harm test to limit the bounds of trustee standing include *Schimmelpenninck v. Byrne (In re Schimmelpenninck)*, 183 F.3d 347, 359 (5th Cir.1999) (holding that actions by creditors asserting a generalized injury to the debtor's estate that ultimately affects all creditors belong to the trustee) and *Scholes v. Schroeder*, 744 F.Supp. 1419, 1422 (N.D.Ill.1990) (holding that "[f]raud on investors that damages those investors is for those investors to pursue—not the [trustee]. By contrast, fraud on the [corporate] entity that operates to its damage is for the [trustee] to pursue...." (emphasis deleted)).

In *Henderson v. Buchanan (In re Western World Funding)*, 52 B.R. 743 (Bankr. D.Nev.1985), *aff'd in part, rev'd in part* 131 B.R. 859 (D.Nev.1990), *rev'd* 985 F.2d 1021 (9th Cir.1993), the bankruptcy court de-

scribed the distinction between claims arising from general versus individual harm to creditors:

> Where the injury alleged is primarily to the corporation, and is an injury to the plaintiff creditor only insofar as it decreases the assets of the corporation to which he must look for satisfaction of his debt, then the suit is for a tort suffered by the corporation, and properly brought by the trustee; if there is a special damage to the creditor suing, not common to other creditors, then it is a personal creditor action which the trustee may not pursue.

*Id.* at 775. *See also Schimmelpenninck,* 183 F.3d at 360 (distinguishing "[a]ctions by individual creditors asserting a generalized injury to the debtor's estate, which ultimately affects all creditors" from "[a]ctions by individual creditors that affect only that creditor personally" and holding that the "trustee is the proper party to advance the first ... kind[ ] of claim[ ], and the creditor is proper party to advance the [second]"); *Koch Ref. v. Farmers Union Cent. Exch., Inc.,* 831 F.2d 1339, 1348–49 (7th Cir.1987) ("[T]he trustee has no standing to bring *personal* claims of creditors. A cause of action is 'personal' if the claimant himself is harmed and no other claimant or creditor has an interest in the cause. But allegations that could be asserted by any creditor could be brought by the trustee as a representative of all creditors. If the liability is to all creditors of the corporation without regard to the personal dealings between [the defendant] and such creditors, it is a general claim."). Allowing a bankruptcy trustee to pursue general creditor claims "ensures that the estate will not be wholly or partially consumed for the benefit of one creditor, or even a small number of creditors." *Schimmelpenninck,* 183 F.3d at 360. *Accord Agri-BioTech,* 319 B.R. at 221 ("[P]ermitting the trustee to pursue general creditor claims serves the orderly and equitable distribution of the bankrupt's assets.").

As the court in *AgriBioTech* noted, although the two lines of cases described above formulate the test for trustee standing somewhat differently, they "are consistent with each other and with the holding[ ] in *Caplin....*" *Id.* All of these cases

> stand for the proposition that a bankruptcy trustee has the right to bring any action in which the debtor has an interest because this is property of the estate, the trustee is acting to benefit the debtor's estate, and is ultimately benefiting the estate's creditors upon distribution, but trustees may not assert personal claims on behalf of certain creditors where the estate has no interest in the claims. The question in each case is whether the claim asserted by the trustee is one in which the estate has an interest, and is therefore property of the estate from which the estate, and derivatively the creditors as an undifferentiated whole, ultimately will benefit.

*Id.* at 221–22 (citations and internal quotation marks omitted).

Application of these principles to the present case leads to the inescapable conclusion that the Trustee lacks standing to assert the OPSA Damage Claim against the Defendants. Ohio Revised Code § 1333.93 allows "[a]ny person who has paid consideration for the chance or opportunity to participate in a pyramid sales plan or program" to recover both the amount of consideration paid and reasonable attorney fees from any participant who has received compensation either "[f]or introducing the person into participation" in the program or "[w]hen another participant has introduced the person into participation in [the] pyramid sales plan or program." Ohio Rev.Code Ann.

§ 1333.93(A) and (B). The statute creates a cause of action in favor of participants in a pyramid plan or program who lose the funds that they pay into the program and against those who receive compensation for introducing the injured participant into the program. The Trustee did not, and cannot, allege that Canyon paid consideration for the opportunity to participate in a pyramid sales plan or program. Indeed, Canyon was the operator of the pyramid scheme and the recipient of the consideration paid by those who sought to participate in its gold coin programs. Nor did the Trustee allege that Canyon suffered any form of injury that would give rise to a right of action under Ohio Revised Code § 1333.93. Thus, under the decisions that analyze the question of trustee standing by looking to state law to determine whether an asserted claim belongs to the debtor, Rieser would not have standing to assert the OPSA Damage Claim against the Defendants.

The Trustee fares no better under the "general"—versus—"individualized"— harm test. Ohio Revised Code § 1333.93—by allowing a participant's recovery of the consideration he/she paid for the opportunity to participate in a pyramid sales plan or program, plus attorney fees—creates the quintessential claim for "special damage to the creditor suing" that is "not common to other creditors." *Western World Funding*, 52 B.R. at 775. In sum, no matter how the standing question is formulated, the answer is the same—the Trustee lacks standing to pursue the OPSA Damage Claim, either in his capacity as an estate or creditor representative.

### V. Conclusion

In conclusion, for the reasons stated above, the Motion is **GRANTED** in part and **DENIED** in part. The Court concludes that there is no genuine issue as to any material fact and that the Trustee is entitled to judgment as a matter of law, and hereby **GRANTS** summary judgment in favor of the Trustee as to the following: (1) that the Debtor was continuously insolvent from its inception in May 1996 through the Petition Date; (2) the Debtor was engaged in a Ponzi scheme from May 1996 through the Petition Date; (3) that the Trustee may avoid all transfers of false profits, commissions and overrides from Canyon to the Defendants made within one year of the Petition Date pursuant to 11 U.S.C. § 548(a)(1); (4) that the Trustee may avoid all transfers of false profits, commissions and overrides from Canyon to the Defendants made from the inception of Canyon's operations in May 1996 through the Petition Date pursuant to 11 U.S.C. § 544(b)(1) and Ohio Revised Code §§ 1336.04 and 1336.05; and (5) the good faith defense to a fraudulent transfer claim set forth in 11 U.S.C. § 548(c) is not available to the Defendants. Further, the Court concludes that while Canyon's contracts with the Defendants are void under Ohio Revised Code § 1333.93, the Trustee lacks standing to recover damages and reasonable attorney fees from the Defendants under the OPSA. Thus, Count Seven of the Complaints is **DISMISSED.**

Trial on all remaining issues will be set by separate order of the Court.

**IT IS SO ORDERED.**